CLAUDE A. JESSUP and MAMIE A. JESSUP, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jessup v. Commissioner
Docket No. 6751-75
United States Tax Court
T.C. Memo 1977-289; 1977 Tax Ct. Memo LEXIS 152; 36 T.C.M. (CCH) 1145; T.C.M. (RIA) 770289; August 25, 1977, Filed As Amended September 8, 1977 As Amended November 17, 1977 *152 Held, petitioner has established the worthlessness of Haymac S.A. stock as of December 31, 1967. Held further, petitioner failed to sustain his burden of proving worthlessness of Universal Minerals and Metals, Inc. stock and notes. Held further, petitioner is engaged in the trade or business of lending, endorsing and guaranteeing; and loans to and guarantees made on behalf of Haymac S.A. and Mr. W. Hayden were proximately related to that business. Held further, petitioner is not entitled to a total worthless bad debt deduction as he was holding valuable second mortgages and other collateral securing the debt; petitioner is not entitled to partially worthless bad debt deduction since he failed to sustain his burden of establishing the value of the land securing the mortgages. Frederick L. Russell, for the petitioners. John C. McDougal, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined deficiencies and petitioners have claimed overpayments in petitioners' Federal income taxes for the calendar years as follows: Year
Deficiency
Overpayment
1967
$134,293.94
2185,085.50
1968
95,385.45
173,986.16
1969
2,083.37
112,338.58
1970
830.39
191,432.10
*153 Due to concessions made by the parties, only three issues remain for our determination: (1) whether petitioner's stock in Haymac, S.A., became worthless in 1967, so as to entitle petitioners to a deduction for worthless securities under section 165(g), (2) whether stock owned and notes held by petitioner in Universal Minerals and Metals, Inc., became worthless in 1968, so as to entitle petitioner to a deduction for worthless securities under section 165(g) and a bad debt deduction under section 166, and (3) whether petitioners are entitled to a bad debt deduction under section 166, during 1967, 1968, 1969, or 1970 for an amount paid under petitioner's guarantees or obligations of William Hayden and Haymac, S.A. during 1967. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners, Claude A. Jessup and Mamie A. Jessup, husband and wife, resided in Charlottesville, Virginia, at the time of filing their petition herein. Petitioners filed joint Federal income tax returns for the calendar years 1967, 1968, 1969 and 1970 with the internal revenue *154 service center, Philadelphia, Pennsylvania. Petitioners also filed an amended income tax return for the taxable year 1967 with the internal revenue service center, Philadelphia, Pennsylvania. Claude A. Jessup (hereinafter petitioner) purchased in 1926 a small bus company and began work as both a driver and executive. From this meager start petitioner expanded the company's operations and by the early 1960's he and his family controlled companies which operated the Trailways bus system from Maine to North Carolina along the eastern seaboard and westward to Cincinnati, Ohio. By the early 1960's and continuing through the years herein involved petitioner was active in areas other than bus transportation. Among other activities, he was chairman of the board of directors of a regional insurance company, a founder and director of a small business investment company, president and director of two hotel companies and a director and executive committee member of a national bank. During each of the taxable years 1967 through 1970 petitioner reported income or loss from two partnerships, from two or three small business corporations, from drilling and operating oil and gas wells, from racing *155 and breeding horses and as a lender, endorser and guarantor. During the taxable years herein involved and for a number of years earlier and subsequently, petitioner engaged personally in lending, endorsing and guaranteeing loans for persons and firms. In most instances petitioner received interest on his loans or a fee for his guarantee or endorsement, which amounts he reported as ordinary income on his Federal income tax returns. During the period 1964 through 1974, [1] *156 petitioner's total annual income from lending, endorsing and guaranteeing was as follows: Year
Income
1964
$ 12,425.00
1965
0
1966
1,241.87
1967
21,000.00
1968
8,769.00
1969
11,824.00
1970
1,852.07
1971
56,705.30
1972
10,805.47
1973
224,099.38
1974
148,800.96 This income arose from transactions involving 31 separate transactions from 17 persons or entities who made credit arrangements through petitioner's efforts. The aggregate amount at risk in these transactions on an annual basis ranged from a low of $315,000 to a high of $2,695,000. The persons and entities involved were not controlled corporation, partners, employees or relatives, and petitioner testified that only a few of the debtors were more than casual acquaintances. Petitioner did not maintain an office for these activities, did not keep any particular hours for the loan transactions nor did he advertise that he was in the loan business.Both petitioner and his attorney testified that petitioner spent 20 to 25 percent of his time on credit transactions. Petitioner estimated that he made loans to only one out of 10 persons who contacted *157 him. One person for whom petitioner guaranteed loans was William M. Hayden. Hayden was the developer of a system designed to recover a pure form of copper powder from copper scrap metal, and in 1963 had been engaged for several years in attempting to exploit commercially his copper scrap development. In furtherance of his objective, Hayden organized a Panamanian corporation, Haymac, S.A. (Haymac), to utilize the copper process in Italy and the European Common Market. Hayden owned 16.4 percent of the stock and was the chief executive officer of Haymac which controlled the European rights to the copper refining process. The commercial exploitation of the copper refining process required large amounts of capital, which Hayden and Haymac were unable to borrow on their own credit. Having been introduced to petitioner by a Washington, D.C. stockbroker, Hayden negotiated with petitioner, who for a guarantor's fee agreed to guarantee a loan from Chase Manhattan Bank to Hayden. On or about August 23, 1963, petitioner guaranteed a $175,000 loan from Chase Manhattan Bank to Hayden. Hayden applied the proceeds of his loan to the exploitation of the copper scrap process through Haymac. *158 Petitioner received as a guarantor's fee $10,000 cash, 3,000 shares of Universal Minerals and Metals, Inc. (Universal), valued at 50 cents per share or $1,500 and an option to purchase an additional 3,000 shares of Universal at $6.50 per share, valued at $150. As security for the August 23, 1963 loan, Hayden took out policies of term life insurance payable to Chase Manhattan Bank. While the application for life insurance was pending, Hayden and his wife delivered to petitioner under cover of letter second mortgages on two residential properties in East Hampton and Fieldston, New York and a first mortgage on an unimproved lot in East Hampton. The first mortgage on the unimproved lot in East Hampton was made by Hayden; the second mortgage on the residential property in East Hampton was made solely by Hayden's wife, Rose B. Hayden; and the second mortgage on the residential property in Fieldston was made solely by Hayden. Each of the mortgages recited on its face to secure the payment of an indebtedness of $175,000." These three mortgages were not recorded when delivered but were simply held by petitioner as additional security, even after the life insurance policies were issued. *159 On January 7, 1964, petitioner guaranteed the payment of a $200,000 loan from the Marine Midland Trust Company of New York (Marine Midland) to Haymac. The note for this loan was executed by Haymac and endorsed by Hayden. The guarantor's fee received by petitioner in connection with this transaction consisted of $8,125 cash and 60 shares of Haymac. The face amount of the term insurance on Hayden's life was increased to cover this loan. While the application for the insurance policy was pending Hayden delivered to petitioner additional mortgages on the three properties described above. Petitioner did not record these mortgages either but simply held them continuing to do so even after the life insurance policies were issued. All three of the 1963 mortgages were delivered to petitioner by mail under cover of a letter from Hayden which stated in pertinent part: I hereby undertake to purchase life insurance covering my life and naming you as beneficiary in an amount sufficient to liquidate the aforesaid loan. Pending the receipt by you of satisfactory proof of the existence of such insurance, you will not record the mortgages listed here except in the event of my prior demise or *160 default on said loan.Immediately following your receipt of proof of such insurance, you will return to me the said mortgages. The delivery of the 1964 mortgages contained no cover letter but petitioner testified that he understood that these mortgages were also intended as collateral security pending issuance of the additional insurance policy on Hayden's life. On January 20, 1965 petitioner guaranteed the payment of a $227,500 loan from Marine Midland to Haymac. The note for this loan was executed by Haymac and endorsed by Hayden. Haymac used the proceeds of this loan to pay off the outstanding $200,000 loan and to pay expenses incurred in connection with the copper scrap process. Petitioner did not receive a fee or additional collateral for this guarantee. On July 1, 1965 petitioner guaranteed the payment of a $5,000 loan from Marine Midland to Hayden. Hayden applied the proceeds of this loan to the promotion of the copper scrap process through Haymac.Petitioner received no fee and no additional collateral for this guarantee. Haymac was unable to get started in business as the copper refining process turned out to be too expensive to be practical. In late 1965 Hayden, the *161 chief operating officer of Haymac, suffered a serious heart attack and has been bedridden ever since. During that same year petitioner, upon purchasing shares of Haymac, was elected a member of the board of directors. During 1966 petitioner and his attorneys attempted unsuccessfully, through the use of telephone calls and actual meetings, to pressure Hayden and Haymac into keeping their loans current. Before his heart attack Hayden personally conducted Haymac's activities. Haymac was a "one-man operation"; the only other employee was Hayden's secretary. At some point prior to 1967, Hayden stopped paying the premiums on the life insurance that petitioner held as collateral for the loans. Petitioner began paying the premiums and continued to do so through 1968. In 1967 the loans were called by the bank and upon default by Haymac and Hayden, petitioner paid the outstanding balance of the loans in the amount of $407,265. Upon payment under the guarantees, the bank turned over to petitioner the collateral for the loans, consisting of 43,500 shares of Universal stock. In early 1967 the two mortgages dated August 23, 1963 were recorded. The 1963 mortgage on the unimproved East Hampton *162 property and the three 1964 mortgages were never recorded. Other than his holdings of 16.4 percent of the Haymac stock, the 43,500 shares of Universal stock, and the real property used to secure the petitioner's guarantees, Hayden had no substantial assets available for repaying the loans. On his income tax return for the taxable year 1967, petitioner claimed a bad debt deduction in the amount of $200,915, representing the difference between the amount paid under the guarantees and the value he assigned to the collateral. On his return, petitioner assigned the following values to the collateral: Bronx, [Fieldston] N.Y., improved real estate
$ 60,000
East Hampton, N.Y. improved real estate
130,000
East Hampton, N.Y. unimproved real estate
12,000
43,500 shares Universal Minerals and Metals, Inc.
4,350
$206,350 Respondent disallowed the deduction, and petitioner now claims that he is entitled to deduct the entire amount of the notes as a business bad debt in 1967 or, in the alternative, 1968, 1969 or 1970. Petitioner testified that he desired to write off the entire indebtedness on his 1967 income tax return but gave in to the tax return preparer's insistence that a decrease in the write-off *163 be made for the collateral retained by petitioner. Petitioner was advised by his attorneys that the mortgages were unenforceable in 1967 when recorded because of the obligation to return them upon issuance of the insurance on Hayden's life and that the statute of limitations rendered the mortgages unenforceable. In 1969 the party, who purchased Hayden's interest in the improved Fieldston property, desired clear title and negotiated with petitioner for an assignment of petitioner's interest in the property. By agreement petitioner received $25,000 for that interest. In 1964 petitioner acquired 330 shares of Haymac stock at a cost of $64,265. On his income tax return for 1967, petitioner claimed a long-term capital loss in that amount for worthlessness of the stock. Respondent disallowed the deduction on the ground that petitioner had not established that the stock became worthless in that year. Universal was attempting to accomplish domestically what Haymac had attempted overseas; produce copper with an impractical refining process. Petitioner testified that, when he paid the guarantees in 1967, Universal's liabilities exceeded its assets. Petitioner also testified that Universal *164 closed its door permanently in 1968 and went into bankruptcy in 1969. Sometime prior to 1968 petitioner acquired a note of Universal at a cost of $325,000. Petitioner contends that the Universal notes and the stock received as collateral for the payment on his guarantees became worthless in 1968 whereas respondent has conceded that they were worthless in 1969. OPINION 1. Haymac stock loss
The first issue for decision is whether, as petitioner contends, stock owned in Haymac became worthless in 1967. If so, petitioner is entitled to a deduction pursuant to section 165[2] for the resulting loss. The question is purely factual and petitioner has the burden of proof. Boehm v. Commissioner,326 U.S. 287 (1945), reh, den. 326 U.S. 811 (1946). We believe that petitioner has sustained this burden. In Morton v. Commissioner,38 B.T.A. 1270, 1278-79 (1938), affd. 112 F. 2d 320 (7th Cir. 1940), *165 the Board set forth the standards for a determination of worthlessness as follows: * * * [A] loss by reason of the worthlessness of stock must be deducted in the year in which the stock becomes worthless and the loss is sustained, that stock may not be considered as worthless even when having no liquidating value if there is a reasonable hope and expectation that it will become valuable at some future time, and that such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. Such events are called "identifiable" in that they are likely to be immediately known by everyone having an interest by way of stockholdings or otherwise in the affairs of the corporation; but, regardless of the adjective used to describe them, they are important for tax purposes because they limit or destroy the potential value of stock. The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both *166 factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. Thus to prevail, petitioner must prove loss of liquidating and potential value of Ahymac as of December 31, 1967. In meeting this standard, petitioner must also show a relevant "identifiable event" in Haymac's life. Petitioner, at trial, introduced a balance sheet of Haymac, dated December 31, 1966, which showed liabilities substantially in excess of assets. Petitioner also testified that the assets which consisted primarily of an option on a plant site and deposits on two European subsidiaries of Haymac were of a nonrefundable nature. Finally petitioner *167 testified that Hayden, the chief operating officer for Haymac, suffered a heart attack in 1965 and has been bedridden ever since.
"The taxpayer is not required to ascertain at his peril the year in which such value may become extinct, provided the stock is still held and there may be some future value, and provided further that there is an absence of an identifiable event which has been brought to the taxpayer's knowledge and which clearly evidences the destruction, either then or theretofore, of value." Gowen v. Commissioner,65 F. 2d 923, 924 (6th Cir. 1933). In our opinion the overriding "identifiable event" which demonstrated the loss of potential value of the Haymac stock was the call of its loan. Until that occurrence in 1967 evidencing withdrawal of the confidence of the corporation's bank, there was nothing to foreclose at least the possibility of realization of liquidating or potential value. Accordingly we hold that petitioner has sustained his burden of establishing that the Haymac stock was worthless in 1967. 2. Worthlessness of Universal Minerals and Metals Stock and Notes
Petitioner contends that the Universal stock and notes became worthless in 1967 or 1968 whereas *168 the respondent has conceded that they were worthless in 1969. Petitioner has the burden to establish that he has sustained a worthless stock loss and bad debt loss for the year in issue. Boehm v. Commissioner,supra;Mueller v. Commissioner,60 T.C. 36 (1973), affd. in part, 496 F. 2d 899 (5th Cir. 1974). Applying the standards for a detrmination of worthlessness to the facts herein, it is again incumbent upon petitioner to prove loss of liquidating and potential value, this time, of Universal as of December 31, 1967 or December 31, 1968. In meeting this standard, we cite again the necessity for a relevant "identifiable event" in Universal's life. Morton v. Commissioner,supra.
Petitioner testified that Universal was not operating in 1967, that there never was a market for its stock, that it was insolvent in 1967, that it closed its door in 1968 and entered bankruptcy in 1969. It is not at all clear from the record herein that the financial position of Universal was such as to foreclose any reasonable expectation of eventual collection of the notes or return of value prior to 1969. Neither Universal's financial statements nor any indication of petitioner's attempts to collect *169 on the notes were presented to this Court. No satisfactory evidence was submitted from which "an independent judgment of assets and liabilities or of ultimate collectibility can be made." Pachella v. Commissioner,37 T.C. 347 (1961), affd. 310 F.2d 815 (3d Cir. 1962). Consequently, we hold that petitioner has not sustained his burden of establishing that the stock and notes became worthless prior to 1969, the year in which the corporation went into bankruptcy. 3. Bad Debt Deduction
Petitioner contends that payment on his guarantees in 1967 of Hayden and Haymac loans is deductible in the year 1967 as a business bad debt under the provisions of section 166(a)(1). Petitioner's position is that he was in the business of lending money for profit and that the bad debts were incurred in conncelion with such business.Respondent contests the year of worthlessness of the obligations and maintains that petitioner's loss, if any, is deductible only as a nonbusiness bad debt under section 166(d).
Section 166(d)(2) defines a nonbusiness bad debt as a debt of a taxpayer other than a corporation--other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business *170 of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Thus to prevail petitioner must establish that his activities as a lender, endorser and guarantor were so extensive and continuous as to elevate that activity to the status of a separate business. Imel v. Commissioner,61 T.C. 318, 323 (1973); Rollins v. Commissioner,32 T.C. 604, 613 (1959), affd. 276 F. 2d 368 (4th Cir. 1960); Barish v. Commissioner,31 T.C. 1280, 1286 (1959). After a careful study of the evidence presented and observance of petitioner's credible testimony, we believe that his activities as a lender, endorser and guarantor were such as to constitute a trade or business within the meaning of section 166. [3]
From 1964 through 1974 petitioner engaged in 31 lending, endorsing and guaranteeing transactions with 17 persons or entities. The aggregate amount at risk in these transactions on an annual basis ranged *171 from a low of $315,000 to a high of $2,695,000. Petitioner in almost all cases received interest payments or a guarantor's fee. These transactions were arms-length. The persons and entities involved were not controlled corporations, partners, employees, relatives or close personal friends; each had a regular commercial business undertaking for which credit assistance was needed from petitioner. Petitioner and his attorney testified that petitioner spent about 20-25 percent of his time on credit transactions and that he was only able to accommodate one in ten persons that requested credit assistance. Respondent, in seeking to establish that petitioner was not in the business of making loans, relies on the extensiveness of petitioner's other business activities, the fact that petitioner did not actively seek out customers, did not advertise that he was in the loan business, and did not maintain a separate office for his loan business. See Inited States v. Henderson,375 F. 2d 36, 41 (5th Cir. 1967). It is true that petitioner was involved in diverse activities but it is well settled that a taxpayer can be engaged in several trades or businesses at one time. Cushman v. United States,148 F. Supp. 880, 887 (D. Ariz. 1956). *172 Indicia of a loan business--the seeking out of customers, advertising and the maintenance of a separate office--were all absent from petitioner's loan business merely because of the peculiar nature of his business. Petitioner lent money only to those persons who were unable to get financing from other financial institutions. He did not advertise because he relied on his reputation among banks, stockbrokers and real estate promoters to get him business. Petitioner had no need to maintain a separate office or set aside specific hours because he had made arrangements with his company to use his work office. Thus we hold that petitioner's lending activities were sufficiently extensive and continuous so as to constitute a trade or business.
Under section 166 the character of a bad debt is determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. Only if the debt bears a proximate relationship to the taxpayer's trade or business will it qualify for a business bad debt deduction under section 166(a). Sec. 1.166-5(b), Income Tax Regs. Whether a bad debt is proximately related to the taxpayer's trade or business *173 is determined by the "dominant motivation" of the taxpayer in acquiring the debt. United States v. Generes,405 U.S. 93, 103 (1972), reh. den. 405 U.S. 1033 (1972). Petitioner testified that he was fascinated with the business of financing and considered himself to be in the lending business by virtue of his activities. Petitioner was engaged personally in arranging credit for persons and entities in consideration for interest or guarantor's fees. After considering the record as a whole, we conclude that petitioner's dominant motive in making the guarantees and loans was business related. The question thus narrows to whether the debts became worthless during 1967, 1968, or 1969 as claimed by petitioner. The question of worthlessness is one of fact to be determined from all the facts and circumstances of each individual case, Perry v. Commissioner,22 T.C. 968, 973 (1954), with the burden of proof on the petitioner. Mueller v. Commissioner,supra at 41. Although petitioner, as guarantor paid the Haymac and Hayden obligations in 1967, he cannot per se deduct the payment, but rather must show that he cannot recover on the debt from the primary debtors. See Sass v. Commissioner,17 B.T.A. 261, 263 (1929). *174 We held earlier that petitioner's shares in Haymac became worthless in 1967. We also made reference to the fact that Hayden, in 1965, suffered a heart attack and has been bedridden ever since. The parties have stipulated that other than his ownership in Haymac and Universal and the real property used to secure petitioner's guarantees, Hayden had no substantial assets available for repaying his loans. The parties further stipulated that petitioner and his attorneys attempted, unsuccessfully, by telephone calls and actual meetings to pressure Hayden and Haymac to keep their loans current.
It is clear from the record that both Hayden and Haymac were insolvent and unable to pay their obligations. A debt is not wholly worthless, however, to the extent that collateral securing a debt has value. See Hunt v. Commissioner,33 B.T.A. 946, 950-51 (1936); Sharp v. Commissioner,8 B.T.A. 399 (1927). Respondent contends that petitioner is not entitled to a bad debt deduction because petitioner was holding valuable security for the Hayden and Haymac notes in the form of mortgates on real estate and 43,500 shares of Universal. We agree. At the time petitioner paid the guarantees, the lender *175 gave him the collateral it had been holding in the form of 43,500 shares of Universal. Petitioner was also in possession of mortgages on three parcels of property which had been given to petitioner by Hayden while an application for life insurance on Hayden's life was pending. In claiming a deduction for partial worthlessness of the Hayden and Haymac obligations on his 1967 income tax return, petitioner assigned a value to the collateral securing the debt as follows: Bronx, [Fieldston] N.Y. improved real estate
$ 60,000
East Hampton, N.Y. improved real estate
130,000
East Hampton, N.Y. unimproved real estate
12,000
43,500 shares, Universal Minerals and
Metals, Inc.
4,350
$206,350 Petitioner now contends that the security was totally worthless during that year. Although petitioner took great pains at trial to make the point that he considered the security worthless in 1967, and only assigned it a value at the insistence of his attorney, it is our opinion that the most telling piece of evidence as to the value of the collateral is the value given it by the petitioner and his attorneys at the time of filing his income tax return. Moreover, petitioner's argument that the mortgages were valueless *176 during 1967 is belied by the fact that, in 1969, petitioner released one of the mortgages for $25,000. Petitioner was also in possession of collateral with value in that we previously held that the 43,500 shares of Universal were first worthless in 1969. The consequence of petitioner's holding valuable collateral is that, since he is in the trade or business of lending and guaranteeing, he would be permitted a deduction for partially worthless business debts. Thus petitioner would be entitled to a partially worthless bad debt deduction to the extent that the value of the property less the first mortgage was insufficient to liquidate the second mortgage plus other collateral. Hunt v. Commissioner,supra;Sharp v. Commissioner,supra.Unfortunately petitioner has not introduced any evidence with respect to the value of the property securing the mortgages. In view of the foregoing, we must hold that petitioner has failed to establish that the debts involved herein became partially worthless during 1967 through 1970. Consequently respondent's disallowance of petitioner's bad debt deduction is hereby sustained. Petitioner also argues that the mortgages were worthless because they were *177 unenforceable in 1967 due to an obligation to return them upon issuance of the insurance on Hayden's life. Petitioner introduced a letter from Hayden in which Hayden demanded return of the mortgages only when satisfactory proof of the existence of sufficient insurance to cover the loan was provided. Although the record is silent as to the precise terms of the agreement between Hayden and petitioner, it is obvious that, once Hayden stopped paying the premiums on the insurance, petitioner retained the mortgages as security for the payment of the remaining premiums. It is our opinion, based on a careful study of the record, that petitioner's retention of the mortgages was not inconsistent with the terms of the above mentioned letter and that the mortgages did not become unenforceable upon issuance of the insurance policy. Petitioner's final point with respect to the mortgages is that, at the latest, they should be held to be worthless in 1969, because of the expiration of the 6 year New York statute of limitations. Under New York State law the time period on the statute begins to run when the mortgagee is entitled to demand full payment. See Bergenfeld v. Midas Collections, Inc.,321 N.Y.S. 2d 989, 66 Misc. 2d 665 (S. Ct. 1971), *178 modified on other grounds, 331 N.Y.S. 2d 485, 38 App. Div. 2d 939 (App. Div. 1972). Under the facts herein, it is quite obvious that petitioner was not entitled to demand full payment from Hayden until he was called upon to pay the guarantees. [4]
In view of the foregoing, Decision will be entered under Rule 155. Footnotes
1. At trial respondent objected to the introduction into evidence of those parts of the stipulation which relate to the years 1971 through 1974 as irrelevant. Rule 401 of the Federal Rules of Evidence defines "relevant evidence" as follows: "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. In order to be deemed relevant, proffered evidence need not prove the ultimate fact in issue; it only must tend to make the existence of any fact more or less probable. It is clear that the years 1971 through 1974 make more probable the fact that petitioner was engaged in an extensive and continuous trade or business. Accordingly respondent's relevance objection must be rejected.
2. SEC. 165(g). Worthless Securities.-- (1) General Rule.--If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.↩
3. Because we hold that petitioner was engaged in the trade or business of lending, endorsing and guaranteeing, we need not reach petitioner's claim that he sustained bad debt losses as guarantor of noncorporate obligations under sec. 166(f)↩.
4. Petitioner's reliance on Martin v. Stoddard,127 N.Y. 61, 27 N.E. 285 (1891), is unfounded. In that case the court held at page 286: * * * and, as the time when payment was to be made does not appear, it will be presumed that it was made payable on demand; and, the thing promised being the payment of money, the statute of limitations began to run from the date of the instrument, at which time the demand could have been made. The debt involved in the Martin↩ case, however, was the conventional type mortgage whereas in the present case it is clear that petitioner, as guarantor, had no right to demand payment prior to payment of his guaranty obligation.