T.C. Memo. 2016-188

UNITED STATES TAX COURT

MARY L. HATCHER AND BRADLEY J. HATCHER, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

MARY L. HATCHER a.k.a. Mary L. Bell, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 23243-13, 23720-13.          Filed October 6, 2016.

Mary L. Hatcher and Bradley J. Hatcher, pro sese.

Stephanie J. Rakoski, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, Judge:  With respect to petitioner wife's Federal income tax for
2008, the Internal Revenue Service (IRS or respondent) determined a deficiency of
$106,733 and an accuracy-related penalty of $21,347 under section 6662(a).  With

**[\*2]** respect to petitioners' joint Federal income tax for 2010, the IRS determined a deficiency of $100,924 and a section 6662(a) penalty of $20,185.[1]

After concessions,[2] the principal issue for decision is whether petitioners for 2010 are entitled to a business bad debt deduction under section 166(a). We hold that they are not; as a corollary, we conclude that petitioners did not have a net operating loss for 2010 available for carryback to petitioner wife's 2008 return. We also hold that petitioner husband does not qualify as a real estate professional for 2010 and so petitioners may not deduct a $21,624 rental real estate loss; that petitioner wife for 2008 is liable for an accuracy-related penalty; and that petitioners for 2010 are liable for most but not all of the accuracy-related penalty that respondent has determined.

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[2]For 2008 respondent concedes that petitioner wife is entitled to a deduction of $1,379 for a capital loss carryforward (and to a corresponding reduction to any penalty determined for 2008). For 2010 respondent concedes that petitioners are entitled to a deduction of $4,324 for health insurance premiums. For 2010 petitioners concede: (1) that petitioner husband failed to report $3,600 of nonemployee compensation; (2) that petitioners are not entitled to deductions in the aggregate amount of $68,558 as claimed on two Schedules C, Profit or Loss From Business; and (3) that petitioners are liable for additional self-employment tax, in the amount calculated by respondent, in the event we determine (as we do) that they are not entitled to the claimed business bad debt deduction. All other adjustments (apart from those discussed in the text) are computational.

**[*3]** <center>FINDINGS OF FACT</center>

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated by this reference. Petitioner wife, Mary B. Hatcher, formerly Mary Bell (Mary), was single for taxable year 2008. She married Bradley J. Hatcher (Bradley) in July 2010. They resided in Texas when they filed the respective petitions.

Mary received an undergraduate business degree and an M.B.A. in corporate finance. From 2000 through 2010 she was employed by Blockbuster Corp., initially serving as vice president for investor relations and, from 2007 through 2009, as senior vice president and treasurer. In the latter capacity she was responsible for the company's investor relations, treasury functions, risk management, financial planning, and tax.

Mary's employment with Blockbuster ended in the summer of 2010. Thereafter she worked as an independent contractor for Blockbuster, consulting on several media-related transactions. Blockbuster reported her nonemployee compensation for 2010 on Form 1099-MISC, Miscellaneous Income. Since 2011 Mary has been a partner in a private equity firm specializing in transactions involving technology and media.

**[\*4]** Bradley likewise has an extensive business background, primarily involving origination of real estate loans. As a result of the financial crisis he became unemployed in late 2009; during 2010 health problems limited his physical activity. He did not originate any real estate loans during 2010. However, he anticipated that he might return to this line of business in the future, e.g., when loans that he had brokered previously matured and the borrowers sought to refinance.

A.      The Bad Debt

During 2004 and 2005 Mary made a series of loans to Brad Carpenter, whom she was then dating. Mr. Carpenter was unemployed at the time but was working on developing a golf-themed comic strip called "In the Rough." Mary advanced money to Mr. Carpenter to fund the development of his comic strip and to pay certain of his personal living expenses.

Mary first advanced $75,000 in March 2004. Mr. Carpenter signed a promissory note for that amount bearing interest of 5% annually. The note was to be repaid "based on mutually agreed company performance, beginning 1 year following distribution or licensing agreement" of his comic strip. Mary did not investigate Mr. Carpenter's ability to repay the loan when making this initial advance or any subsequent advances. She did not ask him to provide bank

[*5] statements, credit reports, tax returns, or other financial information, nor did she require collateral.

In April 2004 Mary advanced Mr. Carpenter another $50,000, which he used to purchase a Hummer. Over the following year Mary made additional transfers to Mr. Carpenter. Although they stopped dating in August 2005, she continued to advance funds for two more months, with the last transfer occurring on October 21, 2005. In total she advanced Mr. Carpenter $430,500; respondent does not dispute that this constituted a bona fide debt.

On June 1, 2006, Mr. Carpenter signed a promissory note (Carpenter note) evidencing this indebtedness, which superseded the March 2004 note. This note explicitly stated that the purpose of the loan was to fund his personal expenses and the development of his comic strip. It bore interest of 5% and was payable in full on December 31, 2007.

Mr. Carpenter did not pay the Carpenter note at the prescribed time. However, he had obtained employment as the executive producer of a film project, and Mary believed that the resulting income might enable him to repay the note. In February 2008 and April 2010 she and Mr. Carpenter executed amendments to the Carpenter note; the latter amendment required Mr. Carpenter to repay the note in monthly installments of $1,000. Between March and October 2010 he made six

[*6] payments totaling $7,000; he made no subsequent payments. Petitioners on their 2010 tax return did not report any interest income attributable to the Carpenter note.

During December 2010 Mary and Mr. Carpenter exchanged a series of emails in which she noted his default and demanded payment. Mr. Carpenter expressed hope that he could still repay the Carpenter note, but in a December 17, 2010, email he stated: "I have no money." Mary viewed this statement as indicating that he would make no further payments.

In February 2011 Mary sent Mr. Carpenter a formal notice of default and filed suit in an attempt to collect on the Carpenter note. On February 15, 2012, she obtained a judgment against Mr. Carpenter for damages of $573,175 and attorney's fees of $50,000. In an effort to collect on this judgment, she served discovery to investigate Mr. Carpenter's sources of income; she alleged that he was receiving disability income of $7,500 per month and had bank deposits from an unexplained source. During late 2012 Mary was still in negotiations in an effort to collect the debt. As of December 31, 2010, the Carpenter note had not become completely worthless.

Starting in 2004 Mary had used her business contacts to introduce Mr. Carpenter to people who might assist him in getting his comic strip syndicated. She

[*7] received no fees for these services. Apart from the Carpenter note and amendments thereto, there were no contracts between Mary and Mr. Carpenter. She obtained no ownership interest in the comic strip and had no right to share in any profits it might generate. Her sole opportunity for profit with respect to the comic strip was the repayment of the principal of the Carpenter note with interest.

During 2004-2010 Mary was not engaged in the trade or business of lending money or in any trade or business other than her employment with (or consulting for) Blockbuster. Her decision to lend money to Mr. Carpenter was motivated chiefly by their personal relationship. She would not have lent money to another individual or business on similar terms, and she did not lend money to anyone else during 2004-2010. She was not involved in the development of any media property, apart from Mr. Carpenter's comic strip, during this period.

On October 21, 2010, Mary contributed the Carpenter note to MBH Partners, LLC (MBH), a limited liability company that she had formed the previous day. MBH had its business address at her home, and she was its sole member. Mary formed MBH as an entity through which she allegedly intended to conduct future advisory and consulting work. During 2010 MBH had no customers or clients, and it engaged in no lending activities or other trade or business. Mary's

[*8] principal purpose for contributing the Carpenter note to MBH was to enhance the appearance that the note was business-related.

B.  Rental Property

Before his marriage to Mary in July 2010, Bradley resided in a house on Anita Street in Dallas, Texas (Anita property). Petitioners owned this house after the marriage; it was unoccupied during the first half of 2010 and occupied by a tenant during the second half. On Schedule E, Supplemental Income and Loss, petitioners reported for 2010 a loss of $21,625 attributable to the Anita property.

Petitioners produced no contemporaneous (or other) documentation concerning the amount of time they devoted to the Anita property. Bradley testified that, during the first half of 2010, he performed routine maintenance and made light repairs to prepare the property for rental. He estimated that these chores consumed 10 to 15 hours per week. During the second half of the year, he estimated that he devoted 10 hours per month to the Anita property. Petitioners submitted no evidence on this issue apart from Bradley's testimony.

C.  Return Preparation and Examination

Mary timely filed her 2008 individual return reporting adjusted gross income (AGI) of $491,576 and tax due of $121,875. In February 2011 she filed an amended return for 2008 on which she claimed a $3,000 long-term capital loss

[*9] carryforward not reflected on her original return. The IRS abated tax of $1,379 attributable to this amended return and issued her a refund.

Mary prepared petitioners' 2010 joint return on which they reported negative AGI of $257,816. Petitioners included two Schedules C with this return. The first Schedule C, for a business described as "Financial and Real Estate Consulting," reported Mary's compensation from Blockbuster for her consulting services. The second Schedule C, for MBH, reported no revenues or income but claimed a bad debt loss deduction of $600,847 attributable to the alleged worthlessness of the Carpenter note. This claimed loss deduction represented unpaid principal of $430,500 plus accrued interest of $170,347. Petitioners had not previously reported any of this interest as taxable interest on a Federal income tax return. On Schedule D, Capital Gains and Losses, petitioners reported for 2010 a net long-term capital loss of $433,985 from the sale of Blockbuster stock, coupled with a capital loss carryforward.

Petitioners' 2010 return created a net operating loss (NOL) that they allocated in full to Mary, and she then carried this claimed NOL back to her 2008 taxable year. In March 2011 she submitted Form 1045, Application for Tentative Refund, seeking a refund of $105,353 for 2008 on this ground. The IRS processed the Form 1045 and issued Mary the refund she requested.

**[\*10]** The IRS selected petitioners' 2010 return and Mary's 2008 return for examination. It disallowed for 2010 the business bad debt deduction attributable to the Carpenter note and (as a corollary of that determination) disallowed the claimed NOL carryback to 2008. The IRS also disallowed the claimed Schedule E loss deduction, determining that petitioners were ineligible to deduct rental real estate losses under section 469(i) because their AGI exceeded $150,000. The IRS made several minor and computational adjustments, see supra p. 2 & note 2, and determined an accuracy-related penalty for each year. Respondent issued petitioners timely notices of deficiency, and they timely petitioned this Court. The two cases were consolidated for purposes of trial, briefing, and opinion.

## OPINION

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The taxpayer bears the burden of proving his entitlement to deductions allowed by the Code and of substantiating the amounts of claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), Income Tax Regs. Because we decide these cases on a preponderance of the evidence, we need not

[*11] decide which party has the burden of proof.  See sec. 7491(a); Estate of Turner v. Commissioner, 138 T.C. 306, 309 (2012).

## A.    The Bad Debt Deduction

Section 166(a)(1) provides that "[t]here shall be allowed as a deduction any debt which becomes [wholly] worthless within the taxable year."  For a nonbusiness bad debt held by a taxpayer other than a corporation, section 166(a)(1) does not apply, and the taxpayer is allowed a short-term capital loss for the taxable year in which the debt becomes completely worthless.  Sec. 166(d)(1); sec. 1.166-5(a)(2), Income Tax Regs.  Because petitioners for 2010 had an existing capital loss in excess of $430,000, and because an individual for any year cannot deduct against ordinary income a capital loss in excess of $3,000, see section 1211(b), petitioners could derive no current tax benefit in 2010 from claiming a loss deduction for the Carpenter note unless that note were classified as a business debt.

Section 166(d)(2) defines a business debt as "a debt created or acquired * * * in connection with a trade or business of the taxpayer" or "a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."  To be eligible to deduct a loss as a business bad debt, a taxpayer must show that she was engaged in a trade or business and that the debt was proximately related to her trade or business.  Putoma Corp. v. Commissioner, 66 T.C. 652, 673 (1976),

**[\*12]** aff'd, 601 F.2d 734 (5th Cir. 1979); sec. 1.166-5(b), Income Tax Regs. A taxpayer may be engaged in more than one trade or business at a time. See Bell v. Commissioner, 200 F.3d 545, 547 (8th Cir. 2000), aff'g T.C. Memo. 1998-136. But to be engaged in a trade or business, the taxpayer must participate in the activity with continuity and regularity, and her primary purpose for engaging in the activity must be for income or profit. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). The management of one's investments, no matter how extensive, is not a "trade or business." Whipple v. Commissioner, 373 U.S. 193, 200 (1963).

1.      Business vs. Nonbusiness Debt

Although petitioners assert that the Carpenter loan was a business debt, they have not identified any trade or business with which it could be associated. Mary was not engaged in the trade or business of lending money when she advanced funds to Mr. Carpenter. When one individual lends money to another, "[t]he right to deduct bad debts as business losses is applicable only to the exceptional situations in which the taxpayer's activities in making loans * * * [are] so extensive and continuous as to elevate that activity to the status of a separate business." Imel v. Commissioner, 61 T.C. 318, 323 (1973); Cooper v. Commissioner, T.C. Memo. 2015-191, at \*13 (describing factors used to evaluate whether a taxpayer's lending activity rises to the level of a discrete trade or business).

[*13] Nothing in the record indicates that Mary was ever in the business of lending money. She was employed full time by Blockbuster during 2004-2005, and she never lent money to anyone but Mr. Carpenter, whom she was dating at the time. See Cooper, at *15. In making these advances she did not conduct herself as a prudent lender would; she performed no credit checks, sought no financial information, and required no security. We find no evidentiary support for the proposition that the Carpenter note was "a debt created or acquired * * * in connection with a trade or business" of lending money in which Mary was personally engaged. See sec. 166(d)(2)(A).

Nor was any loss on the Carpenter note "incurred in the taxpayer's trade or business," namely, Mary's occupation of serving as a Blockbuster employee. See sec. 166(d)(2)(B). Although she testified that she occasionally worked on deals for media content in her role as a Blockbuster executive, lending personal funds to developers of comic strips (or other media content) was clearly beyond the scope of her corporate duties. Blockbuster permitted its executives to pursue outside investment activities, provided those activities entailed no conflict of interest. But such activities, by definition, were not incurred in Mary's trade or business as a Blockbuster employee.

**[*14]** Finally, petitioners presented no evidence that Mary was engaged during 2004-2010 in any media-related business apart from that of being a Blockbuster executive or consultant. Citing her familiarity with licensing entertainment products, petitioners urge that she engaged during 2004-2010 in the business of "developing media content," of which Mr. Carpenter's comic strip was supposedly an example. But she exercised these skills solely in her capacity as a Blockbuster executive; there is no evidence that she offered (or would have been permitted by her employer to offer) these services to others. She cited no example of any content-development activity, apart from "In the Rough," with which she was involved during 2004-2010. And even there her role was limited to that of an investor: She financed Mr. Carpenter's activity rather than directly participating in it. See Commissioner v. Groetzinger, 480 U.S. at 35 (noting that a "sporadic activity" does not qualify as a trade or business).

Assuming arguendo that Mary was engaged in some trade or business apart from her employment, the circumstances surrounding the Carpenter note indicate that it lacked a proximate relationship to such business. A loss is deductible as a business bad debt only if the taxpayer is in a business and the debt in question is proximately related to that business. United States v. Generes, 405 U.S. 93, 96 (1972); Dagres v. Commissioner, 136 T.C. 263, 282 (2011). To determine wheth-

[*15] er a loss is proximately related to the taxpayer's business, we evaluate her dominant motive for making the loan. Generes, 405 U.S. at 103.

In Viani v. Comissioner, T.C. Memo. 1994-471, 68 T.C.M. (CCH) 776, we considered the taxpayers' dominant motive in guaranteeing bank loans for their son's farm. Although the taxpayers were previously farmers themselves, we found that their dominant motivation for extending credit was affection for their son and the desire to see him succeed in farming. Viani, 68 T.C.M. (CCH) at 786. We noted that the taxpayers "would not have agreed to the loan guarantees that they undertook on behalf of their son for anyone else." Ibid. We accordingly ruled that they did not incur a business bad debt loss when, upon their son's default, they paid off the bank pursuant to their guaranty.

Several factors pointing to the nonbusiness character of the debt in Viani point to the same conclusion here. Mary's dominant motivation for lending money to Mr. Carpenter was personal, stemming from their romantic relationship during 2004-2005. She would not have lent $430,500 to anyone else on comparable terms, and she in fact made no loans to anyone else. Before advancing funds, she did not perform a credit check on Mr. Carpenter or review financial information relevant to his ability to repay. And one explicit purpose of the loan was to fund Mr. Carpenter's personal living expenses, including the purchase of a Hum-

[*16] mer. These circumstances paint the Carpenter loan as a personal favor rather than an activity proximately connected with a profit-seeking business.

In an apparent effort to portray a personal bad debt as a business bad debt, Mary contributed the Carpenter note to MBH in October 2010, shortly before declaring the note worthless. The Carpenter note clearly was not "acquired * * * in connection with" any trade or business carried on by MBH. See sec. 166(d)(2)(A). Mary testified that she formed MBH as the vehicle through which she intended to provide advisory and consulting services after leaving Blockbuster's employ. MBH had no customers or clients during 2010, and it engaged in no lending activities or other business during that year. And even if MBH were thought to have conducted a trade or business during 2010, the Carpenter note was not proximately related to it. MBH was not in the debt collection business, and it is hard to see how an asset that Mary allegedly believed to be worthless could have a proximate connection to her future consulting business.

In sum, we find that the Carpenter note was not "created or acquired * * * in connection with" any trade or business conducted by Mary or MBH and that it was not "a debt the loss from the worthlessness of which * * * [was] incurred" in any trade or business conducted by Mary or MBH. Sec. 166(d)(2)(A) and (B). The

[*17] Carpenter note was therefore a nonbusiness bad debt which, upon becoming worthless, would generate only a short-term capital loss. See sec. 166(d)(1)(B).

2.    Worthlessness During 2010

Section 166(a)(1) allows a deduction for a business bad debt loss only if the debt "becomes [wholly] worthless within the taxable year." Even if the Carpenter note were a business debt, petitioners did not carry their burden of proving that the note was wholly worthless as of December 31, 2010. For this reason as well, they were not entitled to either an ordinary or a capital loss deduction for 2010 on account of the Carpenter note.[3]

The year in which a debt becomes worthless is fixed by identifiable events that make it reasonable for the lender to abandon any hope of recovery. Crown v. Commissioner, 77 T.C. 582, 598 (1981). Worthlessness in a particular year is a question of fact that must be determined by "an examination of all the circumstances." Dallmeyer v. Commissioner, 14 T.C. 1282, 1291 (1950). There is no standard test or formula for determining worthlessness; relevant facts include the debtor's solvency and the lender's collection efforts. See Lucas v. Am. Code Co.,

---

[3]If the Carpenter note had become worthless during 2010, petitioners' capital loss would be limited to the unpaid principal, or $430,500. A bad debt deduction on account of accrued interest ($170,347 in this case) would be allowed only if that interest had previously been "returned as income." Sec. 1.166-6(a)(2), Income Tax Regs.

[*18] 280 U.S. 445, 449 (1930); Aston v. Commissioner, 109 T.C. 400, 415 (1997); sec. 1.166-2(a), Income Tax Regs. The taxpayer must establish objective facts from which worthlessness can be determined; mere belief of worthlessness is insufficient. Fox v. Commissioner, 50 T.C. 813, 822-823 (1968), aff'd per curiam, 70-1 U.S. Tax Cas. (CCH) para. 9373 (9th Cir. 1970).

On the record before us, we conclude that the Carpenter note was not wholly worthless as of December 31, 2010. As an identifiable event establishing the note's worthlessness, petitioners point to the December 2010 email in which Mr. Carpenter stated: "I have no money." But petitioners' subsequent actions show that they had not abandoned reasonable hope of recovery.

In February 2011 petitioners commenced litigation against Mr. Carpenter to enforce repayment of the Carpenter note, and they secured a $573,175 judgment the next year. During 2012 they served post-judgment discovery on Mr. Carpenter in an effort to collect on this judgment, alleging that he had substantial monthly income and unexplained bank deposits. They continued negotiations with Mr. Carpenter through late 2012 in an effort to recover at least some portion of the debt. Given petitioners' extensive business and finance backgrounds, it is implausible that they would have kept throwing good money after bad if they genuinely believed the Carpenter note had become wholly worthless two years previously.

[*19] B.    Rental Real Estate Loss

Petitioners for 2010 incurred a rental real estate loss of $21,625 on the Anita property.  Section 469(a) generally disallows a deduction for a  "passive activity loss" incurred by an individual.  Section 469(c) defines "passive activity" to include activity involving a trade or business in which the taxpayer does not "materially participate" and "any rental activity" regardless of whether the taxpayer materially participates.  Sec. 469(c)(1), (2), (4).

Section 469(i) allows an individual who actively participates in a rental real estate activity to deduct against ordinary income up to $25,000 of losses from the activity, but only if his AGI is less than $150,000.  Sec. 469(i)(1) and (2); see sec. 469(i)(3) (providing for gradual phase out of deduction once AGI exceeds $100,000).  Relying on these provisions, petitioners on their 2010 return claimed a $21,625 loss deduction from the Anita property, taking the position that Bradley actively participated in managing the property and that their AGI (owing to the loss on the Carpenter note) was zero.  Upon disallowing the bad debt loss deduction, the IRS likewise disallowed petitioners' claimed Schedule E loss deduction, determining that their AGI exceeded $150,000 and hence that their deduction for passive real estate losses had been completely phased out.  See sec. 469(i)(3).

[*20] Assuming arguendo that no deduction is available under section 469(i), petitioners contend in the alternative that Bradley was a real estate professional-- that is, a taxpayer in a "real property business" within the meaning of section 469(c)(7). That section provides that the rental real estate activities of a real estate professional are not per se passive. Sec. 469(c)(7)(A); see Kosonen v. Commissioner, T.C. Memo. 2000-107, 79 T.C.M. (CCH) 1765; sec. 1.469-9(b)(6), (c)(1), Income Tax Regs. If a real estate professional materially participates in a rental real estate activity, that activity is treated as nonpassive and the section 469(a) disallowance does not apply. See Shiekh v. Commissioner, T.C. Memo. 2010-126; Fowler v. Commissioner, T.C. Memo. 2002-223; sec. 1.469-9(e)(1), Income Tax Regs.

To qualify as a real estate professional, a taxpayer must (among other things) "perform[] more than 750 hours of services during the taxable year in real property trades or businesses in which * * * [he] materially participates." Sec. 469(c)(7)(B)(ii). For taxpayers filing a joint return, only one spouse need qualify under this rule. Sec. 469(c)(2). A "real property trade or business" means "any real property development, redevelopment, construction, reconstruction, acquisition, conversion, rental, operation, management, leasing, or brokerage trade or business." Sec. 469(c)(7)(C). A taxpayer may substantiate the required 750 hours

[*21] of participation by any reasonable means, but a mere "ballpark guesstimate" will not suffice. Moss v. Commissioner, 135 T.C. 365, 369 (2010); sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).

Although Bradley actively participated in managing the Anita property and had previously originated real estate loans, we find that for 2010 he did not qualify as a real estate professional. He did not originate any real estate loans during 2010, and petitioners maintained no documentation of the time they devoted to the Anita property. Bradley credibly testified that he devoted 10 to 15 hours per week to the property during the first half of 2010 and 10 hours per month during the second half. This testimony indicates that he performed at most 450 hours of services in real property businesses during 2010. Because this is short of the 750 hours required, Bradley was not a real estate professional during 2010 and petitioners were not eligible to deduct their $21,624 rental real estate loss.[4]

---

[4]Petitioners contend that Bradley was a real estate professional because he had extensive experience originating real estate loans before 2010. For purposes of deducting passive losses, however, the Code defines a real estate professional, not by reference to his skill set or experience, but by reference (among other things) to his "hours of services during the taxable year in real property trades or businesses." Sec. 469(c)(7)(B)(ii). Bradley's skills in originating real estate loans, and the hours he devoted to loan origination in prior years, are thus irrelevant to the inquiry that we must perform. Because we find that Bradley did not meet the 750 hours requirement, we need not consider whether his prior loan origination activity would constitute a "real property trade or business."

[*22] C.    Accuracy-Related Penalty

The Code imposes a 20% penalty upon the portion of any underpayment of income tax that is attributable (among other things) to "negligence" or any "substantial understatement of income tax." Sec. 6662(a) and (b)(1) and (2). "Negligence" is defined as "any failure to make a reasonable attempt to comply" with the provisions of the Code. An understatement of income tax is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Sec. 6662(d)(1)(A).

In the case of an NOL carryback, the penalty for negligence applies to any portion of an underpayment for the carryback year that is attributable to negligence in the year in which the NOL arose (loss year). Sec. 1.6662-3(d)(1), Income Tax Regs. Similarly, the substantial understatement penalty applies to any portion of an underpayment in the carryback year that is attributable to a "tainted item" in the loss year. Sec. 1.6662-4(c)(1), Income Tax Regs. The determination of whether an understatement is "substantial" for a carryback year is made with respect to the return for that year. Ibid. A "tainted item" is any item for which there is neither substantial authority nor adequate disclosure with respect to the loss year. Id. subpara. (3)(i).

[*23] Under section 7491(c) the Commissioner bears the burden of production with respect to the liability of an individual for any penalty. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Respondent met his burden by showing that petitioners were not entitled to the $600,847 bad debt deduction claimed on their 2010 return or to the $330,239 NOL deduction claimed on Mary's 2008 return. The understatements of income tax attributable to those improper deductions exceed both $5,000 and 10% of the tax required to be shown on each return. The burden thus shifts to petitioners to prove that the penalty does not apply. See id. at 447.

Section 6664(c)(1) provides that the accuracy-related penalty shall not be imposed with respect to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith" with respect to it. The decision as to whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor in determining the existence of reasonable cause is the taxpayer's effort to ascertain her correct tax liability. Circumstances that may signal reasonable cause and good faith "include an honest misunderstanding of fact or law that is reasonable in light of all the facts and circum-

[*24] stances, including the experience, knowledge, and education of the taxpayer." Ibid.

Mary was a sophisticated financial professional with an M.B.A. in corporate finance. She prepared her individual return for 2008 and petitioners' joint return for 2010. She testified that she relied principally on IRS Publication 535, Business Expenses, to determine that the Carpenter note was a business bad debt that had become worthless during 2010. Publication 535 notes that "a business bad debt is one that comes from operating your trade or business." It cautions taxpayers about the disparate treatment of business and nonbusiness bad debts, directing them to Publication 550, Investment Income and Expenses, for instructions regarding the latter.

While testifying that she hoped to profit by lending to Mr. Carpenter, Mary did not explain why she believed that the Carpenter note was a business debt. Her act of contributing that note to MBH in October 2010 suggests that she actually held the opposite belief. MBH was a newly created entity that Mary formed as a vehicle for rendering future consulting services. She offered no plausible business reason for contributing to MBH, as its only asset, a former boyfriend's promissory note that she believed to be worthless. The Court infers that her actual reason for

**[\*25]** making this contribution was to put the Carpenter note into a "business" to enhance the appearance that it was business related.

In any event, petitioners' overall conduct does not show that they made a good-faith effort to determine their correct tax liability with respect to the Carpenter note. The bad debt loss deduction they claimed included $170,347 of accrued interest. Publication 535, upon which Mary said she relied, explicitly informs taxpayers that they can claim a business bad debt deduction for interest "only if the amount owed to you was previously included in gross income." Mary prepared all relevant tax returns, and she knew or should have known that no interest from the Carpenter note was ever included in her gross income.

Publication 535 also makes clear that a debt becomes worthless only when there is no longer any chance it will be repaid. Petitioners were actively pursuing collection remedies against Mr. Carpenter after December 31, 2010, including litigation that yielded them a $573,175 judgment in 2012. They were still pursuing collection from Mr. Carpenter in late 2012 in an effort to secure at least partial repayment of the Carpenter note. These facts show that petitioners did not regard the note as totally worthless at the close of the 2010 tax year.

We find that petitioners did not act with reasonable cause and good faith in claiming a business bad debt loss deduction for the Carpenter note on their 2010

[*26] joint return and that they are liable for the accuracy-related penalty with respect to the portion of the underpayment attributable to disallowance of that deduction. We conclude that petitioners are also liable for the accuracy-related penalty on the portion of the 2010 underpayment attributable to Bradley's unreported income of $3,600 and petitioners' unsubstantiated Schedule C deductions of $68,558. See supra p. 2 and note 2. And because the underpayment for 2008 was attributable to negligence with respect to a "tainted item" in 2010, see sec. 1.6662-4(c)(1), (3)(i), Income Tax Regs., Mary is liable for an accuracy-related penalty with respect to the NOL carryback to that year.

For 2010 we reach the opposite conclusion with respect to the Schedule E loss of $21,625 and the additional self-employment tax. See supra p. 2 & note 2. Bradley actively participated in managing the Anita property, and section 469(i) entitled petitioners to a real estate loss deduction of up to $25,000 on the basis of their AGI as reported on their return. The disallowance of the Schedule E loss deduction, as well as the additional self-employment tax, arose automatically from disallowance of the bad debt loss deduction, which increased their AGI substantially.[5] Our review of the testimony and record as a whole convinces us that

---

[5]The disallowance of the Schedule E loss deduction and the additional self-employment tax are not "tainted items" for purposes of calculating the substantial

(continued...)

**[*27]** petitioners acted with reasonable cause and in good faith with respect to these two items. Accordingly, they are not liable for the accuracy-related penalty on the portion of the 2010 underpayment attributable thereto.

To reflect the foregoing and the concessions of the parties,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.

---

[5](...continued) understatement penalty. The "tainted items" rule applies only to substantial understatements of income tax that are attributable to NOL carrybacks. <u>See</u> sec. 1.6662-4(c)(1), Income Tax Regs.