GEORGE RUPPEL AND SANDRA RUPPEL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ruppel v. Commissioner
Docket No. 24822-84.
United States Tax Court
T.C. Memo 1987-248; 1987 Tax Ct. Memo LEXIS 248; 53 T.C.M. (CCH) 829; T.C.M. (RIA) 87248; May 11, 1987. John T. Blakely and Bruce H. Bokor, for the petitioners. J. Michael Melvin, for the respondent. SCOTT SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax in the amounts and for the years as follows: Year Ending
Deficiency
December 31, 1978
$312,202.76
December 31, 1979
151,687.00
*249 The issue for decision is whether petitioners are entitled to a claimed deduction for a business bad debt in 1978. The determination of this issue depends on whether Mr. Ruppel (petitioner) was engaged in the trade or business of lending money, and if so, whether the debts which became worthless in 1978 were proximately related to petitioner's lending business. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Clearwater, Florida at the time they filed their petition in this case filed joint Federal income tax returns for the calendar years 1978 and 1979 with the Internal Revenue Service Center in Atlanta, Georgia. Their returns were filed on the cash receipts and disbursements method of accounting. For over 20 years prior to the years here in issue petitioner was a bank executive. From August, 1958 until April, 1974, petitioner was *250 president and chairman of the board of directors of the First Park Bank in Pinellas Park, Florida (First Park). From 1964 until 1974, he was a member of the board of directors of the First Commercial Bank in St. Petersburg, Florida, president of the Community Bank of Clearwater in Clearwater, Florida, and president of the Community Bank of Northside in St. Petersburg, Florida. From 1974 until September, 1981, he was vice chairman of the board of the Community Banks of Florida in Seminole, Florida, vice president and member of the board of directors of Community Bank of Pasco in New Port Richey, Florida, and vice president and member of the board of directors of Community Bank of Seminole in Seminole, Florida. During 1980 and 1981, petitioner was a member of the board of directors of Community Bank of Manatee in Brandenton, Florida. In addition to his banking activities, at various times beginning in 1952, petitioner was involved in numerous partnerships, trusts, closely held corporations, joint ventures in real estate and other businesses. For 30 years petitioner was a shareholder, director and/or vice president of a corporation known as Modern Tool and Die, Inc. (Modern Tool), *251 which petitioner and his brothers purchased upon moving to Florida in 1952. Petitioner generally spent a minimum of two hours a day at Modern Tool. In 1954 a group of businessmen in the Pinellas Park community, where Modern Tool is located, decided to organize a bank. They approached the Ruppel brothers, as local businessmen, and sought one of them as a member of the board of directors. Petitioner was selected because he had more of an accounting background than his brothers. In 1958 the bank organizers were offered a charter if they could increase the capitalization of the bank to $400,000. Many of the original organizers thought this sum was too large for such a small community and petitioner took the opportunity to acquire a large interest in the bank, First Park. Petitioner and his brothers borrowed funds from another bank to acquire the controlling interest in First Park. Petitioner became chairman of the board and president of First Park upon its opening in August 1958 and within 6 months was also its chief executive officer. Petitioner served as chief executive officer, devoting about 80 percent of his time to First Park until it was sold for cash in 1973. The remainder *252 of his time prior to the sale of First Park was devoted to Modern Tool and his own lending and personal activities. As a result of the First Park sale, petitioner had a substantial amount of cash available to lend to others. Beginning in 1959, petitioner, either individually or through partnerships and joint ventures of which he was a member, has made loans for profit. Prior to selling First Park, petitioner on occasion borrowed money to fund his lending operation. Because he was able to borrow at a lower interest rate than his customers, he could earn a profit from the interest rate he charged in excess of what he paid. Petitioner maintained books and records relating to his lending activities. He did not advertise, he maintained no office exclusively for his lending activities and had no regular business hours in connection with his lending activities. Petitioner maintained lending records at Modern Tool, First Park, and various Community Banks and met with his borrowers at these locations as needed. Petitioner did not maintain a separate bank account exclusively for his lending activities but used common accounts with his personal activities. He had no employees working *253 exclusively with respect to his lending activities. However, after initially servicing the loans himself, petitioner utilized the employees of Modern Tool, First Park, and Community Banks for this purpose and had his attorneys prepare loan documents when necessary and enforce collections of loans. During 1973 and 1974 petitioner devoted 15 to 20 percent of his time to his personal lending business. Petitioner scheduled appointments to interview potential borrowers. Petitioner required his borrowers to sign interest-bearing promissory notes for their loans. The great majority of these loans were adequately secured and paid in accordance with their terms. The only loan losses experienced on his personal loans, as opposed to partnership-related or capital note transactions, are those which are the subject of this dispute. In addition to the promissory notes and other legal documents which petitioner required, beginning in 1974 payment books and tickler systems were utilized to insure that all the loan payments were timely paid. Amortization schedules containing interest rates and number of payments were printed and distributed to the borrowers. Petitioner had a reputation in *254 his community as a successful businessman with money to lend. Petitioner made loans to only about one out of every four or five individuals who approached him for a loan. Some of the people he rejected, he referred to others to assist them in obtaining loans. To others he gave suggestions on how to improve their credit position in order to obtain the sought-after loans. In June, 1973, petitioner was approached by members of the Petrantoni family about making loans for Trans-State Mining, Inc. The Petrantoni family consisted of Samuel M. Petrantoni, Joseph F. Petrantoni, Yolanda Petrantoni, Linda A. Petrantoni, and Angelo S. Petrantoni. The Petrantonis owned several related corporations whose names all began with Trans-State. These corporations were Trans-State Mining, Inc.; Trans-State Industries, Inc.; Trans-State Hauling, Inc.; Trans-State Construction Company, Inc.; Trans-State Realty and Development Company, Inc.; and Trans-State Realty Corporation (the Trans-State Companies). The principal asset of the Trans-State Companies was its limerock mine in which petitioner saw considerable economic potential. At no time did petitioner have any equity interest in any of the *255 Trans-State Companies, and he was not related by blood or marriage to the Petrantonis. During 1973 and 1974, petitioner made a number of loans in the aggregate principal amount of $1,122,183.03 to the Petrantonis and to certain of the Trans-State Companies. In accordance with generally accepted commercial lending practices, petitioner acquired a security interest in certain assets of the Petrantonis and the Trans-State Companies including their interests in the Scheer lease and other leases. Petitioner's dominant motivation in making the loans to the Petrantonis was to try to earn more than the certificate of deposit rate of interest available on his money. Petitioner continued to advance money to the Petrantonis and/or the Trans-State Companies in order to protect the money he already had at risk. In petitioner's judgment, unless the mine became profitable he would never recover his advances. Additional funds were thus made available to cover operating expenses in the hope that the mine would eventually produce a profit. In late 1973 petitioner acquired a 25% ownership interest in the Scheer lease which was a significant asset of the Trans-State Corporation. The interest was *256 transferred to petitioner in lieu of points to induce him to make further loans. In late 1974 the 25% interest in the Scheer lease was transferred back to the Trans-State Corporation for $100 cash and a promissory note for $28,125.00. Petitioner acquired a security interest in the 25% interest in the Scheer lease. Excluding loans made by petitioner as a member of a partnership, capital note transactions, and loan participation certificates, petitioner made the following individual personal loans between 1971 and 1974: Number
Year
of Loans
Debtor
Amount
1971
4
3 (1 relative and 2
business associates)
1 (minority shareholder)
$ 13,600.00
1972
2
Unrelated parties
17,000.00
1973
17 10: Petrantonis and/or
Trans-State Companies
759,411.33
7 to other parties: Airey
$18,928.76
Airey
15,000.00
Widner
2,000.00
Padfield Const.
20,000.00
Mann
8,200.00
Coon (business
associate)
70,000.00
Boland
6,650.00
140,778.76
1973 TOTAL
$930,790.09
1974
4
3 to Petrantonis
$447,770.70
1 to Widner
500.00
1974 TOTAL
448,270.70
TOTAL AMOUNT
$1,379,060.79
*257 The Petrantonis and the Trans-State Companies defaulted on many of their loans. In 1975 petitioner commenced legal action to foreclose on the security interest he had taken. In 1978, the Petrantonis and the Trans-State Companies became completely insolvent and were unable to pay off their loans, except to the extent of the collateral security. During 1978, petitioner charged off the excess of the outstanding indebtedness over the fair market value of the collateral securing the loans owed to him by the Petrantonis and the Trans-State Companies. Petitioner claimed this excess indebtedness in the amounts of $780,285.70 as a business bad debt deduction. Respondent in his notice of deficiency disallowed petitioner's claimed business bad debt deduction explaining that the debts were non-business debts which did not become worthless in 1978. Because of his disallowance of petitioner's claimed bad debt deduction in 1978, respondent determined that petitioner did not have a net operating loss in 1978 and therefore disallowed petitioner's claimed net operating loss carryover from 1978 to 1979. OPINION *258 Section 166(a) allows a deduction for any business debt which becomes worthless during the taxable year. Section 166(d)(2), which specifically defines a nonbusiness debt, by implication defines a business debt, i.e. -- a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. For petitioner to be entitled to a business bad debt deduction with respect to the Petrantoni/Trans-State loans, he must establish that he was in the trade or business of lending money during the years in question and if he is able to establish that fact, he must show that the loans were proximately related to that business. See United States v. Generes,405 U.S. 93 (1972)
Determining whether a taxpayer is engaged in a trade or business, as opposed to merely having entered into a transaction for profit, has long presented a problem in the resolution of tax controversies. Recognizing that the resolution of the trade or business issue depends upon the facts of each case, the Supreme Court has recently stated: "To be engaged in a trade or business, *259 the taxpayer must be involved in the activity with continuity and regularity and the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S.     (Feb. 24, 1987). This Court has held that a trade or business of lending money is limited to those exceptional situations where the lending activities are "so extensive and continuous as to elevate that activity to the status of a separate business." Imel v. Commissioner,61 T.C. 318, 323 (1973). Respondent contends petitioner's lending activities were neither sufficiently extensive nor continuous to rise to the "exceptional situation" standard. Factors which have been considered in determining whether a taxpayer is engaged in the trade or business of lending money include: the number of loans made by the taxpayer; the time period over which such loans were made; the adequacy and nature of the taxpayer's records; the amount of time devoted to the lending activity; whether the taxpayer actively sought out lending business; whether the taxpayer advertised, *260 or maintained a separate office for the business; the maintenance of separate books and accounts for the business, or profit and loss statements; the taxpayer's general reputation in the community as a lender; and the relationship of the debtors to the taxpayer-lender. United States v. Henderson,375 F.2d 36, 41 (5th Cir. 1967), cert. denied 389 U.S. 953 (1967). Respondent argues that petitioner primarily relies on the number of loans he made, some 124 loans over the period 1970 through 1980. Respondent contends most of these loans were by partnerships of which petitioner was a member or loan participation certificates. Respondent contends that if such loans are not considered to be made by petitioner, petitioner's lending activity is not sufficient to constitute a trade or business of lending money. Respondent argues that the partnership loans and bank loan participation certificates should not be considered as a part of petitioner's lending activities. Without deciding the extent to which these activities are relevant to the issue here presented, we conclude that even without consideration of those activities petitioner was in the trade or business *261 of lending money. Respondent argues that the Petrantoni/Trans-State loans are not sufficient to elevate petitioner's otherwise limited lending activity to a trade or business. Respondent further contends it is inaccurate to treat the Petrantoni/Trans-State loans as separate transactions since "virtually all of the loan proceeds were used but for one purpose -- to develop a limerock mine." Thus, according to respondent "although there were numerous individual paper transactions, in effect most of these [were] attributable to a single lending commitment to make loans over time." Respondent relies on this Court's decision in Sales v. Commissioner,37 T.C. 576 (1961), for the proposition that a single loan is an insufficient basis upon which to justify the existence of a trade or business. Respondent's argument fails to consider the fact that the Petrantoni/Trans-State loans involved some 13 separate transactions, each evidenced by an interest bearing promissory note, and that some of these debts were repaid. Respondent points to no evidence to support his contention that the Petrantoni/Trans-State loans constituted a single lending transaction. In our view petitioner's *262 continuing to make loans to these persons was a valid exercise of business judgment. Petitioner continued to lend money to the Petrantonis since in his opinion this was the only way to recoup his prior advances. Under all the circumstances here present that was a reasonable business decision. [2]
Sales v. Commissioner,supra, relied *263 on by respondent involved one loan by a real estate partnership to a closely held corporation owned by relatives. Under circumstances such as that, it is reasonable to conclude that there was no trade or business. However, the facts in this case are not comparable to the facts in the Sales case. [3]
Petitioner made a number of different loans to the Petrantonis and/or the Trans-State Companies. The evidence indicates that petitioner was aware that the limerock mine was the Trans-State Companies' principal asset. Respondent in his brief admits that petitioner *264 did not become aware that it would take some time for the mine to produce a profit until after he had made several loans to Trans-State. Respondent states that "at this point petitioner determined to continue to furnish sufficient funds to meet recurring operating expenses in order to recoup his original loans." Petitioner's continuing to lend money under these circumstances does not indicate a single lending commitment or mitigate against the conclusion that petitioner was in the trade or business of lending money. Respondent further contends that the amount of petitioner's loans should not be determinative of whether he was in a trade or business of lending money. Respondent argues that "the mere fact that the Trans-State lending commitment resulted in a large loan is not sufficient to place petitioner in the business of lending money even when coupled with petitioner's other lending activities." We have rejected the idea of a single lending commitment. Here we do not have one large loan but a number of loans of significant size ranging from $15,000 to $369,645.70. Respondent makes much of the fact that petitioner's lending activity as an individual lender subsided after 1974. *265 However, the fact that much of petitioner's funds were tied up in the Petrantoni/Tran-State loans explains his decreased lending activities. Respondent's argument with respect to the capital gain reported by petitioner in the years in issue, does not convince us that petitioner had the financial resources to continue lending to the extent he had before the Trans-State loss was occurred. The Petrantoni/Tran-State debtors defaulted on their payments as early as 1975. However, it was not until 1978 that they became insolvent justifying petitioner in writing off the debt. For some three to four years, petitioner was unable to collect the moneys due him but did not have a closed transaction which would justify a write off of the debt. Petitioner contends his lending activities were "so extensive and continuous as to elevate that activity to the status of a separate business." Imel v. Commissioner,supra at 323. Petitioner supports this argument with his claim that he entered over 100 lending transactions involving approximately $6,350,000 with some 76 different entities and individuals from which he reported approximately $400,000 in interest. As noted previously, *266 we conclude that petitioner was in the trade or business of lending money without considering the loans made by partnerships of which petitioner was a member or his loan participation certificate transactions. We have considered petitioner's individual loans between 1970 and 1974. Petitioner need only establish that he was in the trade or business during 1973 and 1974, the years when the loans which became uncollectible were made. During the years 1971 through 1974 petitioner made 27 loans totalling $1,379,060.79 to some 13 different persons or entities. When these facts are considered in light of the other indicia of a trade or business noted earlier, we conclude that petitioner was in the trade or business of lending money. On selling First Park in 1973, petitioner received $2,500,000. Accordingly, his lending transactions increased from two loans in 1972 totaling $17,000 to 17 totaling $930,790.09 in 1973 and four additional loans in 1974 totalling $448,270.70. Petitioner might have sustained this higher level of lending activity had he not lost so much capital to the Petrantonis. However, what he might have done is not relevant to our determination. The fact that he attained *267 this degree of lending activity, based on the number and amount of loans, in 1973 and 1974 leads us to conclude that he was in the trade or business of lending money. In Cushman v. United States,148 F. Supp. 880 (D. Ariz. 1956), a similar conclusion was reached where the extent of lending activity over seven years was only 21 loans totaling $288,352.51. [4]
The evidence shows that during 1973 and 1974, petitioner devoted about 15 to 20 percent of his time to his personal lending business. While this does not represent the majority of petitioner's time, it is well settled that a taxpayer may be *268 engaged in more than one trade or business. Butler v. Commissioner,36 T.C. 1097, 1107 (1961); Cushman v. United States,supra.A taxpayer engaged in more than one trade or business cannot spend a majority of his time on the affairs of each business. Petitioner during the years in issue devoted a significant amount of time to his lending business and this fact is evidence that he was engaged in a trade or business. Petitioner's testimony that he actively sought lending business is supported by the testimony of other witnesses and is uncontroverted. Petitioner testified that he had made it known to bank loan officials for a number of years preceding the years in issue that he was interested in making loans to persons who might be unable to qualify for bank loans. In addition, we have found that petitioner had a general reputation in his community as a person with money available to lend. Petitioner did not advertise in the conventional sense of relying on print, radio or television media. However, as he testified, he had no reason to advertise since the loans found him. We do not perceive petitioner's failure to advertise as significant. *269 Petitioner did not maintain a separate office or telephone for this "business". However, in his positions with Modern Tool and the various banks, he had access to all the facilities that he needed for his business. To have acquired more office space for his personal lending business could be perceived as a needless expense which a prudent business man would not incur. [5]
*270 Respondent argues that the fact that petitioner did not make loans to everyone referred to him, [6] did not maintain completely formal books, failed to report the income on a Schedule C, and failed to maintain a separate bank account for this "business" indicates that he was not in the trade or business of lending money. Petitioner did keep adequate books and records for his lending business. Petitioner introduced into evidence voluminous records of this activity and testified with respect to his procedures. We find plausible his explanation, corroborated by his former secretary, that after loans were paid in full, in some instances loan records were discarded. Reporting an activity on Schedule C is indicative of a trade or business. However, petitioner's failure to so report his income from lending activities on Schedule C *271 is not conclusive of the absence of a trade or business. This is particularly true when as here the return was prepared by a CPA. The maintenance of a separate bank account is some indication that the activity is a trade or business. However failure to maintain such a separate account does not require a conclusion that the taxpayer was not in a trade or business. There are numerous factors indicative of whether a taxpayer is in a trade or business. No one factor is conclusive but all are to be considered and weighed. After considering all the factors in this record, we conclude that petitioner conducted his activities in such a way as to elevate them to a trade or business status even though he did not maintain a separate bank account or separate facilities for his lending business or report the income from that activity on a Schedule C. [7]
Petitioner must further establish that there *272 was a proximate relationship between his lending business and the bad debts sought to be deducted. Section 1.166-5(b), Income Tax Regs. In conjunction with that principle it should be noted that this section states that "[t]he use to which the borrowed funds are put by the debtor is of no consequence in making [this] determination." Petitioner's "dominant motivation" in creating or acquiring the debt is a prime consideration in determining whether the debt is proximately related to his trade or business. United States v. Generes,405 U.S. 93 (1972). Since we have held that petitioner was in the trade or business of lending money, it follows that the most significant loans created with respect to that business were proximately related to it unless the facts show some other reason for the loan. [8]
*273 Respondent argues that petitioner's motivation was investment. The facts in this case support a contrary conclusion. Petitioner testified [9] that his dominant motivation was to earn more interest than was available through the certificate of deposit rate. The fact that in prior years he had borrowed money to enter the lending business indicates that earning interest was a motivating factor in his business decisions. The parties in this case stipulated that the loans petitioner made were made for the purpose of making a profit. Respondent also makes much of the fact that the Petrantoni/Trans-State Companies used the money borrowed from petitioner for operating expenses. However, the regulations make it very clear that the debtors' use of the funds is irrelevant to the proximate relationship determination. The facts show that petitioner had no equity interest in the Trans-State Companies. The interest he acquired in one of the leases was in lieu of points and to induce him to make further loans. This interest was transferred back to the Trans-State Companies for a note. Most of the assets of these corporations were collateral for the loans made by petitioner and this interest *274 when transferred back was added to that collateral. The record also shows that petitioner acquired an option to acquire the mining property adjoining the Trans-States' property. However, petitioner acquired this option in the hope of inducing a potential purchaser to buy the Petrantoni/Trans-State interests. Had the purchase been made petitioner would have been repaid the money he had advanced and received the interest he hoped to earn from these loans. On this record we conclude that petitioner's motive in creating the debts that became worthless was to earn interest and was therefore proximately related to his lending business. Because of an uncontested adjustment in the notice of deficiency, Decision will be entered under Rule 155.
Footnotes
1. In his brief petitioner claims that he is entitled to attorney fees under section 7430. We have not considered this request since it is premature and does not comply with the procedural requirements of Rule 231 of our Rules of Practice and Procedure.↩
2. In Cushman v. United States,148 F. Supp. 880↩ (D. Ariz. 1956), where the taxpayer over an 8-year period made some 21 loans in the amount of $288,352.51, the court concluded that the taxpayer's lending activities in the year in question were sufficiently extensive, regular and varied to elevate her to the trade or business status. The debts she was thus able to deduct as business bad debts were made to the same persons in ten direct loans totaling some $682,241 and with respect to $51,000 in loan guarantees made over a 2-1/2 to 3-year period. The court noted that her motivation in making these loans was to earn interest but recognized that she continued to advance money to a business that ultimately was a losing proposition in order to protect, and hopefully recover, her prior advances to the owners.
3. Similarly respondent's reliance upon Estate of Bounds v. Commissioner,T.C. Memo. 1983-526↩, is misplaced. The Court did conclude the taxpayer was not in the trade or business of lending money in spite of making large loans. However, a number of factors were considered in reaching that conclusion. The taxpayer's activities lacked attributes of a lending business. The taxpayer did not keep books or records of his lending activities and was unable to reconstruct those business activities with any degree of accuracy. The facts here show that petitioner did keep records of his lending activities.
4. This Court has found a lending trade or business where the total number of loans was 66 over 15 years, totaling approximately $2,000,000; more than 40 over 5 years totaling over $300,000; and 31 over 10 years with an outstanding balance ranging from $315,000 to $2,695,000. See McCrackin v. Commissioner,T.C. Memo. 1984-293; Jessup v. Commissioner,T.C. Memo. 1977-289; and Minkoff v. Commissioner,T.C. Memo. 1956-269↩.
5. In Jessup v. Commissioiner,supra, where we concluded the taxpayer was in the trade or business of lending money, respondent likewise attacked the taxpayer's failure to advertise and maintain a separate office. This Court responded "[h]e did not advertise because he relied on his reputation among banks, stockbrokers and real estate promoters to get him business. Petitioner had no need to maintain a separate office or set aside specific hours because he had made arrangements with his company to use his work office. Thus we hold that petitioner's lending activities were sufficiently extensive and continuous so as to constitute a trade or business." Jessup v. Commissioner,supra, 36 T.C.M. 1145, 1151, 46 P-H Memo. T.C. par. 77,289 (1977). See also McCrackin v. Commissioner,supra.↩
6. Petitioner testified that he made loans to about one in four or five referred to him. This Court sustained a trade or business status under circumstances where the taxpayer made loans to only one of ten referrals. Thus petitioner's quantitative rate of acceptance is not in our opinion determinative. See Jessup v. Commissioner,supra.↩
7. See Jessup v. Commissioner,supra; Hutton v. Commissioner,T.C. Memo. 1976-6↩.
8. See Hutton v. Commissioner,supra,↩ where this Court analyzed different types of loans to determine whether they were deductible as business bad debts. With respect to those loans falling within the category of business bad debts, i.e. -- debt created or acquired in connection with a trade or business -- we concluded that since these loans were the primary activity of the taxpayer's loan business, they clearly satisfied the proximate relationship test. It was the second category of business bad debts, i.e, -- a debt the loss from the worthlessness of which was incurred in the taxpayer's trade or business which possed the more difficult analytical problem. We did however conclude that there was such a proximate relationship in that "taxpayers dominant motivation was business-related." In either circumstance, we conclude in the instant case that petitioner's debts were (1) the primary activity in his lending business and therefore clearly proximately related or (2) proximately related because petitioner's uncontroverted dominant motivation in making loans was to earn interest on his money, not to acquire an investment in the Petrantoni/Trans-State activity.
9. We are aware of the United States v. Generes,405 U.S. 93↩ (1972), admonition against reliance on a taxpayer's self-serving testimony. However, such a warning is always true in this court and we as the trier of fact must of necessity consider the taxpayer's veracity in our determinations.