T.C. Memo. 2019-118

UNITED STATES TAX COURT

CHARLES E. BERCY, DECEASED, ELAINE BERCY,
SUCCESSOR IN INTEREST, AND ELAINE BERCY, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18626-17.                          Filed September 11, 2019.

<u>Mark Bernsley</u>, for petitioners.

<u>Michael W. Berwind</u> and <u>Linette B. Young</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  With respect to petitioners' Federal income tax for 2014, the Internal Revenue Service (IRS or respondent) determined a deficiency of $22,750 and an accuracy-related penalty of $4,550.  The principal issue for deci-sion is whether petitioners are entitled to a business bad debt deduction under sec-

[*2] tion 166(a).[1]  We hold that they are entitled to such a deduction and accordingly are not liable for an accuracy-related penalty.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulations of fact and the attached exhibits are incorporated by this reference.  Petitioners were a married couple who resided in California when they filed their petition.  Petitioner husband (Mr. Bercy or petitioner) testified at trial but died several months afterwards.

A.    Petitioner's Lending Activity

Mr. Bercy was at all relevant times a licensed real estate broker in California.  He was the co-founder, president, and major shareholder of the Argus Group (Argus), a California entity that elected S corporation status for Federal income tax purposes.  Argus was chiefly engaged in making mortgage loans secured by real estate, typically short-term speculative loans for residential construction.  Petitioner estimated that Argus had lent at least $750 million since its founding in

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code) in effect for the relevant year, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

**[*3]** 1989. Mr. Bercy also owned Astin-Carr, a company that arranged real estate syndications and regularly supplied capital to Argus.

Apart from his activities for these companies, Mr. Bercy loaned substantial sums for his own account. He estimated that over the years he had made more than $25 million of personal loans. Whenever a plausible borrower approached him about this type of loan, Mr. Bercy investigated the proposed project, sought appraisals, and consulted his personal guidelines for gauging risks and rewards.

Most of the loans Mr. Bercy made for his own account were real estate related. But he also made a variety of personal property loans and even financed a few Hollywood film scripts. He estimated that he typically made one or two personal property loans for his own account annually, including one in 2005 and one in 2007. He pegged the outstanding volume of his personal property loans in 2007 at about $1 million. We found his testimony on these points credible.

In early 2007 Darryl Aken, an acquaintance of Mr. Bercy's, approached him with a proposal for a personal loan. Mr. Aken operated a furniture business in Los Angeles through a limited liability company (LLC) that did business under the trade name Girari. Girari manufactured high-end furniture, which it sold directly to consumers from its showroom. It also rented tables and chairs for use at social events, museum openings, and conferences.

**[*4]** Girari's high-end furniture was popular among Los Angeles party-goers, and in 2007 Mr. Aken sought capital to expand his business to Las Vegas. He told Mr. Bercy that he was looking to borrow $200,000, disclosing that Girari had $400,000 of pre-existing debt. Its pre-existing debt consisted of $200,000 owed to Sylvan Aken, Mr. Aken's mother; $100,000 owed to Sandra Aken, his daughter; and $100,000 owed to Richard Kern, an unrelated party whom Mr. Bercy believed to be a savvy investor. The record does not disclose whether any of these lenders received (or perfected) security interests in Girari's assets.

Although Mr. Bercy, several years previously, had declined an invitation to acquire an equity stake in Girari, he told Mr. Aken that he would consider a loan. Consistently with his due-diligence process, Mr. Bercy investigated Girari. He visited Girari's showroom and reviewed records of its rentals over the previous two years. Impressed by Girari's business plan and Mr. Kern's business reputation, Mr. Bercy decided to lend money.

Not wanting to lend the full $200,000 himself, Mr. Bercy asked another lender, Dennis Levitt, to go 50-50 with him. Mr. Bercy and Mr. Levitt had previously made a personal property loan together. Each agreed to lend Girari $100,000 on substantially identical terms.

**[*5]** B.      The 2007 Note

The record includes copies of the loan documents that the parties thereto executed in March 2007.  None of these documents, which were prepared by Ronald Altman, Mr. Bercy's lawyer, contains original signatures.  Mr. Bercy credibly testified that he had shredded the originals in a house-cleaning exercise mandated by his wife, and Mr. Aken kept no copies after he sold Girari's assets in 2014.  However, Mr. Altman kept digital versions of the loan documents on his law firm's computer system.  We find that these versions, coupled with the testimony of Messrs. Altman, Aken, and Bercy, are sufficient to establish the basic terms of the loan.

The parties executed a promissory note whereby Mr. Bercy and Mr. Levitt each lent $100,000 to Girari.[2]  The note bore interest at 11.25%, had a one-year maturity, and was structured as a line of credit such that Girari could draw up to $200,000 in principal.  Mr. Aken personally guaranteed the note.  The parties executed a security agreement whereby Girari gave Messrs. Bercy and Levitt equal security interests in its assets (and proceeds of any sale of assets).

---

[2]Mr. Bercy's share of the loan was made by a grantor trust, and for our purposes he is treated as having lent the funds directly.  See sec. 671.

**[*6]**  Shortly after the closing Messrs. Bercy and Levitt each disbursed $50,000 to Girari.  Each disbursed another $50,000 to Girari a month or so later.  Although the loan was secured by Girari's assets, the lenders neglected to file financing statements with the California secretary of state to perfect their security interests.

C.  Restructuring the Debt

The 2007-2008 financial crisis was unkind to Girari.  As demand for new homes shriveled, so did demand for its furniture.  And as businesses, conventions, and party hosts scaled back their entertaining, demand for high-end rental furniture cratered.  When the promissory note came due in March 2008, Girari was unable to repay.

As a real estate lender, Mr. Bercy had bigger problems at that point, so he declined to seek an immediate remedy for Girari's default.  Enforcing the security agreement would have required legal expenses and left him with large volumes of furniture for which there was little demand.  Instead, Mr. Bercy resolved to let Mr. Aken, who had expertise in the furniture industry, attempt to restructure Girari and find a way to repay the loan.

Mr. Aken regularly communicated with Mr. Bercy, Mr. Levitt, and his other lenders about his efforts to repay Girari's loans.  In 2010 Mr. Aken concluded that selling Girari was the only viable way to manage repayment.  He explored sale of

**[*7]** the company to a Canadian buyer and to Cort Furniture Rental, a large U.S. firm. When those efforts failed, he explored alliances with other party-rental companies, but those overtures were likewise unsuccessful.

By early 2013 Girari had not been sold, and Mr. Levitt had grown impatient. He agreed to take $25,000 in complete satisfaction of the $100,000 that he was owed. Mr. Bercy and the other lenders believed that they stood to recover more if they waited until Mr. Aken found a suitable buyer for Girari. They accordingly acquiesced in Mr. Levitt's exit on these terms.

Mr. Levitt and Girari executed an agreement under which he would receive, in satisfaction of his $100,000 loan, $25,000 in seven installments during 2013. The agreement stated that, if Girari failed to pay $25,000 by December 31, 2013, Mr. Levitt would be free to pursue full recovery of the $100,000. By year end 2013 Girari had made total payments to Mr. Levitt of only $13,000.

Mr. Aken eventually found a buyer. In 2014 Girari sold its assets to Kool Party Rentals (Kool), an Arizona firm, for $235,000. Kool paid $30,000 in cash and executed a promissory note for the $205,000 balance. The note bore interest at 5% annually and required that principal be repaid in monthly installments of $3,500, plus applicable interest.

[*8] Girari used the $30,000 cash payment to refurbish the rental furniture that was to be delivered to Kool. The first $12,000 paid via monthly installments was allocated to Mr. Levitt to satisfy the balance of his $25,000 claim. The creditors agreed, and the Kool note specified, that the balance of the promissory note, or $193,000, would be paid 20% to Mr. Bercy, 20% to Mr. Kern, 20% to Sondra Aken, and 40% to Sylvan Aken. Mr. Bercy's share of the principal was thus $38,600 (20% × $193,000). Mr. Bercy and the other lenders believed that Girari's and Mr. Aken's obligations to them, originally totaling $500,000, had been completely extinguished upon their receipt during 2014 of ratable interests in the Kool note.

Kool made all payments of interest and principal as scheduled. It sent these payments to Argus, which acted without fee as the servicer for the loan. Argus transmitted to Mr. Bercy and the other lenders their shares of each monthly payment, together with a computerized statement of account showing a breakdown between principal and interest. Kool fully discharged the $205,000 note in April 2017, two years early, by making a lump-sum payment of the balance then due.

D.    Tax Reporting and Trial

On their 2014 Federal income tax return petitioners claimed a business bad debt deduction of $65,000 under section 166(a). They reported this loss on Sched-

[*9] ule C, Profit or Loss From Business, for Mr. Bercy's sole proprietorship activity. Among the expenses of this business they included a $65,000 item captioned "Loan Charge Off--Girari Inc."

Petitioners' accountant calculated the $65,000 loss by valuing Mr. Bercy's interest in the Kool note at $35,000, applying a discount of roughly 9.4% to the $38,600 of principal that he was due. The accountant believed this discount was warranted because: (1) the interest rate on the Kool note was 5%, as opposed to the 11.25% Girari had contracted to pay, (2) repayment of the Kool note was stretched out over several years, and (3) the Kool note was a multiparty loan in which Mr. Bercy held a minority interest, supposedly complicating his ability "to proceed with legal enforcement on his own."

The IRS selected petitioners' 2014 return for examination. On June 5, 2017, it issued them a notice of deficiency disallowing the claimed $65,000 bad debt deduction and determining the deficiency and accuracy-related penalty set forth above. See supra pp. 1-2. As the basis for the disallowance the notice stated: "You did not establish that the business expense shown on your tax return was paid or incurred during the taxable year and that the expense was ordinary and necessary to your business." Petitioners timely petitioned for redetermination, and trial was held in Los Angeles in January 2019.

[*10]                                    OPINION

A.     Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The taxpayer generally bears the burden of proving his entitlement to deductions allowed by the Code and of substantiating the amounts of claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), Income Tax Regs. However, Rule 142(a)(1) provides that respondent shall have the burden of proof "in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer."

The notice of deficiency issued to petitioners disallowed the loss deduction for lack of substantiation, i.e., because petitioners had not established that the expense was "incurred during the taxable year" and "was ordinary and necessary." Petitioners contend that the status of the Girari debt as a business debt requires different evidence and thus constitutes "new matter" on which respondent should have the burden of proof. See Rule 142(a)(1); Shea v. Commissioner, 112 T.C. 183, 191 (1999). Because we find that the preponderance of the evidence favors petitioners on this point, we need not decide who has the burden of proof on the

**[\*11]** "business debt" question. See Estate of Turner v. Commissioner, 138 T.C.

306, 309 (2012), supplementing T.C. Memo. 2011-209, supplemented by 151 T.C.

160 (2018).

B.    Bad Debt Deduction

The Code allows a deduction against ordinary income for a business debt

that becomes wholly or partially worthless during the taxable year.  Sec. 166(a),

(d)(1).  For a nonbusiness bad debt held by a taxpayer other than a corporation,

section 166(a) does not apply, and the taxpayer is allowed a short-term capital loss

for the year in which the debt becomes worthless.  Sec. 166(d)(1); sec. 1.166-

5(a)(2), Income Tax Regs.

We have found as a fact that Mr. Bercy disbursed $100,000 to Girari in

2007, and respondent agrees that this extension of credit was a bona fide loan.

The issues remaining for decision are:  (1) whether the loan constituted a business

or nonbusiness debt, (2) whether the loan became wholly or partially worthless in

2014, and (3) if so, the amount of the deduction to which petitioners are entitled.

1.    Business vs. Nonbusiness Debt

Section 166(d)(2) describes a business debt as "a debt created or acquired

* * * in connection with a trade or business of the taxpayer" or "a debt the loss

from the worthlessness of which is incurred in the taxpayer's trade or business."

**[\*12]** The status of a debt as a business debt presents a question of fact. See sec. 1.166-5(b)(2), Income Tax Regs. To be eligible to deduct a loss as a business bad debt, the taxpayer must show that he was engaged in a trade or business and that the debt was proximately related to that trade or business. Putoma Corp. v. Commissioner, 66 T.C. 652, 673 (1976), aff'd, 601 F.2d 734 (5th Cir. 1979); sec. 1.1665(b), Income Tax Regs. To be engaged in a trade or business, the taxpayer must participate in the activity with continuity and regularity, and his primary purpose for engaging in the activity must be for income or profit. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). Whether the debt has a proximate relationship to the taxpayer's trade or business turns on the taxpayer's dominant motivation in making the loan. Putoma Corp., 66 T.C. at 673.

We find that Mr. Bercy was engaged in a distinct trade or business of lending money. Aside from his activities on behalf of Argus and Astin-Carr,[3] Mr. Bercy personally made loans to a variety of borrowers, solely for his own account, on a regular basis. His personal lending activity was substantial, comprising numer-

_____

[3]Argus was engaged in the business of making real estate loans, and Mr. Bercy supplied capital to Argus directly (as a shareholder of that S corporation) and through Astin-Carr (an entity he wholly owned). Petitioners do not contend that Mr. Bercy should be deemed to be in the lending business solely by virtue of the activities conducted by his S corporation. Cf. Dagres v. Commissioner, 136 T.C. 263, 289 (2011) (holding that managing member of an LLC was deemed to carry on the lending business of his LLC).

**[*13]** ous loans totaling an estimated $25 million. And he engaged in this activity with the intent of making a profit.

Mr. Aken credibly testified that he approached Mr. Bercy because he knew that Mr. Bercy was in the lending business. The fact that the two men were unrelated negated any familial motivation for the loan. Mr. Bercy agreed to lend only after investigating Girari's business and finances, performing due diligence as he did for his other loans. To hedge his bet he secured as a co-lender Mr. Levitt, with whom he had previously joined in making a personal property loan. His behavior in connection with the Girari loan was consistent with his general business practices, and that loan was proximately related to his trade or business of lending money. See Ruppel v. Commissioner, T.C. Memo. 1987-248, 53 T.C.M. (CCH) 829, 834 ("Since we have held that petitioner was in the trade or business of lending money, it follows that the most significant loans created with respect to that business were proximately related to it unless the facts show some other reason for the loan.").

Respondent concedes that "Mr. Bercy was admittedly engaged in the business of real estate lending." But respondent contends that making personal property loans was outside the scope of that business. And in respondent's view, the scale of Mr. Bercy's non-real-estate lending activity was insufficiently robust to

**[*14]** constitute a "trade or business" distinct from his business of real estate lending.

We are not persuaded to construe the term "trade or business" so narrowly in this context. When previously considering the status of loans as "business debts" under section 166, we have not segmented the taxpayer's lending business according to the nature of the loan or type of customer. Rather, we have simply asked whether the taxpayer was in the business of lending money, separate and distinct from any other gainful employment he or she may have had. See, e.g., Yaryan v. Commissioner, T.C. Memo. 2018-129, at *26 ("The parties agree that petitioners were not in a trade or business of lending funds."); Owens v. Commissioner, T.C. Memo. 2017-157, 114 T.C.M. (CCH) 188, 194 (inquiring whether the taxpayer's "personal lending was a trade or business"); Hatcher v. Commissioner, T.C. Memo. 2016-188, 112 T.C.M. (CCH) 415, 418 (finding that the taxpayer "was not engaged in the trade or business of lending money"), aff'd, 726 F. App'x 207 (5th Cir. 2018); Ruppel, 53 T.C.M. (CCH) at 832 (requiring the taxpayer to show "that he was in the trade or business of lending money"); Jessup v. Commissioner, T.C. Memo. 1977-289, 36 T.C.M. (CCH) 1145, 1150 (finding that the taxpayer was "in the business of making loans").

[*15] Respondent errs in relying on <u>Rutter v. Commissioner</u>, T.C. Memo. 2017-174, 114 T.C.M. (CCH) 282. We there disallowed a business bad debt deduction because we found the taxpayer's advances to his corporation to have been equity investments rather than loans. <u>Id.</u> at 286-289. But even if the advances constituted debt, we held that the taxpayer was not entitled to a business bad debt deduction because there was "no support in the record for * * * [his] assertion that he was in the business of lending money." <u>Id.</u> at 289. In <u>Rutter,</u> as in other cases involving this question, we asked whether the evidence established that the taxpayer "was in the lending business." <u>Id.</u> at 290. Answering that question affirmatively here, we find that the Girari loan was a business debt for purposes of section 166.

    2.    <u>Worthlessness in 2014</u>

Section 166(a) allows a deduction for the taxable year in which a business debt becomes wholly or partially worthless. The year in which a debt becomes worthless is fixed by identifiable events that make it reasonable for the lender to abandon any hope of recovery. <u>Crown v. Commissioner</u>, 77 T.C. 582, 598 (1981). "When a debt becomes worthless is to be decided by the trier of fact." <u>Am. Offshore, Inc. v. Commissioner</u>, 97 T.C. 579, 594 (1991) (citing <u>Cole v. Commissioner</u>, 871 F.2d 64, 66 (7th Cir. 1989), <u>aff'g</u> T.C. Memo. 1987-228).

**[*16]** Ascertaining when a debt becomes worthless requires "examination of all the circumstances." Dallmeyer v. Commissioner, 14 T.C. 1282, 1291 (1950). There is no standard test or formula for determining worthlessness, but relevant factors include the debtor's solvency, the lender's collection efforts, and subsequent dealings between the parties. See Lucas v. Am. Code Co., 280 U.S. 445, 449 (1930); Aston v. Commissioner, 109 T.C. 400, 415 (1997); Am. Offshore, Inc., 97 T.C. at 594; sec. 1.166-2(a), Income Tax Regs. The taxpayer must establish objective facts from which worthlessness can be determined; mere belief that a debt has gone bad is insufficient. Fox v. Commissioner, 50 T.C. 813, 822-823 (1968), aff'd per curiam, 70-1 U.S. Tax Cas. (CCH) para. 9373 (9th Cir. 1970). A taxpayer is not required to take legal action to enforce payment where it "would in all probability not result in the satisfaction of execution on a judgment." Sec. 1.166-2(b), Income Tax Regs.

In evaluating a taxpayer's contention that a debt has become wholly or partially worthless, we give weight to the creditor's "soundly exercised business judgment." Portland Mfg. Co. v. Commissioner, 56 T.C. 58, 73 (1971). We do not require a creditor to pursue "theoretical possibilities" of recovery that ignore the "realities of the business environment." ABC Beverage Corp. v. Commissioner, T.C. Memo. 2006-195, 92 T.C.M. (CCH) 268, 272. "Whether a bad debt deduction is

**[*17]** proper must be analyzed according to 'reasonableness, commonsense and economic reality.'" Id. at 271 (quoting Scoville Mfg. Co. v. Fitzpatrick, 215 F.2d 567, 570 (2d Cir. 1954)).

The sale of Girari's assets to Kool was an identifiable event that reasonably caused Mr. Bercy to abandon any hope of recovery beyond the amount to which he was entitled under the Kool note. After Mr. Levitt's departure, Mr. Bercy and the other creditors joined in an agreement to accept pro rata shares of the Girari sale proceeds, via the Kool note, in full settlement of Girari's obligation to them. The creditors viewed the sale of Girari's assets as the only hope of recovery, and they waited patiently for six years for Mr. Aken to find a buyer. Once that sale was consummated, the creditors treated the Kool note as a final settlement that extinguished any claims, by any of them, against Girari or Mr. Aken personally.[4]

Respondent urges that Mr. Bercy could have recovered more than his pro rata share of the Kool note. But it is unclear what the source of that recovery could have been. Girari had sold all of its assets, and Mr. Aken in 2014 appeared to be as asset-poor as he had been when Girari defaulted six years previously. In

_____

[4]The parties' behavior following execution of the Kool note is consistent with their understanding that they had no further claim against Girari or Mr. Aken. If Mr. Bercy believed that he could seek a deficiency judgment against either of them, he presumably would not have shredded his original copy of the Girari note.

[*18] any event Mr. Bercy's ability to sue on Mr. Aken's personal guarantee was uncertain under California law, because more than four years had elapsed since Girari defaulted on the note. See Cal. Civ. Proc. Code sec. 337 (West 2019) (requiring that an action upon an obligation or liability be brought within four years).

Respondent contends that Mr. Bercy's security interest in Girari's assets, though unperfected, attached to the proceeds of the asset sale. And he contends that this security interest gave Mr. Bercy, under California law, "absolute priority over the claims of unsecured creditors." From these premises respondent concludes that Mr. Bercy had priority over Girari's three other creditors and "was entitled to receive 100% of the proceeds from the Kool * * * note" until he was repaid in full.

Accepting arguendo respondent's premises, we do not agree with his conclusion. There is no evidence in the record to indicate whether the loans extended by Girari's three previous creditors--Sondra Aken, Sylvan Aken, and Mr. Kern--were secured or unsecured. More importantly, Mr. Bercy and they had agreed to accept undivided pro rata shares of the Kool note in full payment of their respective claims against Girari. It is difficult to see how Mr. Bercy could have reneged on that agreement by asserting an unperfected, seven-year-old security interest as a

[*19] bar to their entitlements. We find that Mr. Bercy exercised reasonable business judgment in concluding that he stood to recover more by agreeing to divide the proceeds pro rata than by engaging in a potentially costly priority dispute with the other creditors over what was (in comparison with Mr. Bercy's other undertakings) a relatively small amount of money.

In sum, we find that Mr. Bercy reasonably abandoned, in 2014, any hope of recovering more from the Girari loan than his pro rata share of the Kool note. Mr. Levitt, a sophisticated businessman, had previously agreed to accept 25 cents on the dollar in full payment for his $100,000 loan. Mr. Bercy held out longer and his patience was rewarded, netting him 38.6 cents per dollar through the Kool note. We give weight to Mr. Bercy's "soundly exercised business judgment," shared by Girari's other creditors, that the Kool transaction was the endgame. See Portland Mfg. Co., 56 T.C. at 73. Mr. Bercy reasonably concluded that further legal action against Mr. Aken, Girari, or Girari's other creditors "would in all probability not [have] result[ed] in the satisfaction of execution on a judgment." Sec. 1.166-2(b), Income Tax Regs. We accordingly find that the Girari loan became worthless in 2014 except to the extent of the undivided interest in the Kool note that Mr. Bercy received in partial satisfaction of his principal.

[*20] 3.     Amount of Deduction

Section 166(b) provides that the "amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property."  Section 1011 cross-refers to section 1012, which provides that the basis of property is generally its cost.

Mr. Bercy's original cost basis in the Girari loan was $100,000.  To determine the bad debt deduction, we must adjust Mr. Bercy's basis for the value of the property he received in partial repayment of his principal.  See Deutsch v. Commissioner, T.C. Memo. 2012-318, 104 T.C.M. (CCH) 573, 577 ("The adjusted basis of a note equals the face amount of the debt minus any principal paid back by the debtor."); sec. 1.166-1(d), Income Tax Regs.  As repayment of his principal, Mr. Bercy received an undivided 20% interest in the Kool note.

The face value of Mr. Bercy's undivided 20% interest in the Kool note was $38,600, which would produce a bad debt deduction of $61,400.  Petitioners reported a bad debt deduction of $65,000, applying a 9.4% discount to the face value of the property interest Mr. Bercy received.  Petitioners' accountant believed a discount was warranted because:  (1) the interest rate on the Kool note was 5%, as opposed to the 11.25% Girari had contracted to pay, (2) repayment of the Kool note was stretched out over several years, and (3) the Kool note was a multiparty

[*21] loan in which Mr. Bercy held a minority interest, allegedly complicating his ability "to proceed with legal enforcement on his own." Petitioners' accountant did not testify at trial, but his computation is set forth in workpapers he supplied to the IRS during the examination.

Petitioners have not carried their burden of proving that a discount is warranted or (if so) the proper amount of the discount. The fact that the Girari note bore a higher interest rate than the Kool note is irrelevant. The task at hand is to determine the fair market value of Mr. Bercy's share of the Kool note. The interest rate that Girari agreed to pay seven years earlier is immaterial in answering that question. And Mr. Bercy cannot claim a tax loss for interest Girari never paid. A bad debt deduction for accrued but unpaid interest is allowable only if the interest was previously reported by the taxpayer as taxable income. See Fed. Home Loan Mortg. Corp. v. Commissioner, 121 T.C. 279, 284 (2003).

A discount might be appropriate if the 5% interest rate on the Kool note was artificially low, but petitioners have supplied no reason to believe that it was. Kool was unrelated to Girari's creditors and operated at arm's length with them. The accountant's workpapers do not address (and petitioners presented no evidence concerning) Kool's creditworthiness, prevailing interest rates in 2014, or comparable interest rates for a loan of this size and quality. If the 5% interest rate

[*22] adequately compensated Mr. Bercy for the time value of money--and there is no evidence to the contrary--it is immaterial that repayment stretched out over several years.

Finally, petitioners have not shown that a discount was justified on the ground that Mr. Bercy held a minority interest in a multiparty note. The four creditors agreed that Argus, Mr. Bercy's firm, would service the loan. Kool made all payments to Argus, and it disbursed funds ratably to Mr. Bercy and the other three creditors. Since Argus controlled the cashflow and acted for the creditors as a group, we are not convinced that Mr. Bercy was meaningfully disadvantaged by his minority position or by inability "to proceed with legal enforcement on his own."

In sum, we find that Mr. Bercy made, in connection with his business of lending money, a business loan of $100,000 to Girari in 2007. In partial satisfaction of that debt in 2014, he received a 20% interest in a note with a face value of $193,000. Petitioners have not shown that any discount was justified, so the property Mr. Bercy received was worth $38,600, the face value of his interest in the note. At that point Mr. Bercy had no reasonable prospect of recovering any more of his principal investment. Petitioners were thus entitled for 2014 to a business bad debt deduction of $61,400 under section 166(a).

**[*23]** To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.